**Dudley FEIT, Plaintiff,**

v.

**LEASCO DATA PROCESSING EQUIP-
MENT CORPORATION et al.,
Defendants.**

**No. 69 Civ. 1329.**

United States District Court,
E. D. New York.

Aug. 26, 1971.

---

9. See, Speed v. Transamerica, 99 F.Supp. 808 at 849 (D.Del.1951).

Sidney B. Silverman, New York City, for plaintiff; Joan T. Harnes, Jewel H. Bjork, New York City, of counsel.

Willkie, Farr & Gallagher, New York City, for Leasco Data; Anthony Phillips, L. Robert Griffin, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for Lehman Brothers; Rogers Doering, Charles Edelman, Dean C. Rohrer, New York City, of counsel.

Shearman & Sterling, New York City, for White Weld; Robert F. Dobbin, Joseph McLaughlin, New York City, of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This case raises the question of the degree of candor required of issuers of securities who offer their shares in exchange for those of other companies in take-over operations. Defendants' registration statement was, we find, misleading in a material way. While disclosing masses of facts and figures, it failed to reveal one critical consideration that weighed heavily with those responsible for the issue—the substantial possibility of being able to gain control of some hundred million dollars of assets not required for operating the business being acquired.

 Using a statement to obscure, rather than reveal, in plain English, the critical elements of a proposed business deal cannot be countenanced under the securities regulation acts. The defense that no one could be certain of precisely how much was involved in the way of releasible assets is not acceptable. The prospective purchaser of a new issue of securities is entitled to know what the deal is all about. Given an honest and open statement, adequately warning of the possibilities of error and miscalculation and not designed for puffing, the outsider and the insider are placed on more equal grounds for arms length dealing. Such equalization of bargaining power through sharing of knowledge in the securities market is a basic national policy underlying the federal securities laws.

## I. PROCEEDINGS

In this class action plaintiff seeks damages resulting from alleged misrepresentations and omissions in a registration statement prepared in conjunction with a 1968 offering of a "package" of preferred shares and warrants of Leasco Data Processing Equipment Corporation (Leasco) in exchange for the common stock of Reliance Insurance Company

550

(Reliance). He is a former shareholder of Reliance who exchanged his shares for the Leasco package. Suit was commenced in October 1969 on behalf of all Reliance shareholders who accepted the exchange offer between August 19, and November 1, 1968.

It is alleged that Leasco (1) failed to disclose an approximate amount of "surplus surplus" held by Reliance and (2) failed to fully and accurately disclose its intentions with regard to reorganizing Reliance or using other techniques for removing surplus surplus after it had acquired control. These failures, it is claimed, represented material misrepresentations or omissions in violation of Sections 11, 12(2), and 17(a) of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(2), and 77q(a)), Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78n(e)), and Securities and Exchange Commission Rule X–10B–5 (17 C.F.R. § 240.10b–5).

Defendants are Leasco, the issuer; Saul P. Steinberg, Leasco's chief executive officer; Bernard ·L. Schwartz, Leasco's President; Robert B. Hodes, Leasco's general counsel and a director; and White, Weld & Co. and Lehman Brothers, the dealer-managers. In addition to denials, the answers raise a number of defenses.

## II. THE EXCHANGE OFFER

During the period August 19, through November 1, 1969 Leasco offered one share of convertible preferred stock and one-half warrant of Leasco in exchange for each share of Reliance common stock tendered. The preferred shares offered carried a $2.20 annual dividend and a conversion value of $55 if converted into common stock. The warrants permitted the holder to purchase Leasco common stock for $87 per share at any time up to June 4, 1978.

Reliance common shares had a market value of approximately $30 in December of 1967. As word of an impending takeover attempt spread, the price rose gradually to a high of $99⅞ during the tender offer period. The price of Leasco

common shares was also rising during this period. On August 16, 1968, the last trading day before the exchange offer was effective, Leasco common stock closed at $87⅝ while its warrants were listed at a high bid of $43. Reliance shares were then selling at $66¼.

By September 13, 1968, 3,994,042 shares of Reliance, amounting to 72% of those outstanding, had been tendered and Leasco had obtained control of Reliance. Leasco ultimately acquired 97% of Reliance's common stock by the termination of the tender offer on November 1, 1968.

## III. SURPLUS SURPLUS

### A. Definition of Surplus Surplus

Reliance's surplus surplus is the central element in this litigation. Leasco's desire to acquire it provided much of the original impetus for the exchange offer. Lack of disclosure of facts relating to the amount of surplus surplus and Leasco's intentions concerning its use, as well as the materiality of those omissions provide the basis of plaintiff's complaint. Finally, the method and difficulty of ascertaining its amount is critical to the defendants' affirmative defense. We cannot proceed without examining the concept.

Reliance is a fire and casualty insurance company subject to stringent regulation by the Insurance Commissioner of Pennsylvania. Such a company is required by the regulatory scheme to maintain sufficient surplus to guarantee the integrity of its insurance operations. Such "required surplus" cannot be separated from the insurance business of the company. That portion of surplus not required in insurance operations has been referred to as surplus surplus. In a widely relied upon report to the New York Insurance Department, the matter was summed up as follows:

> "The 'required surplus' is one that will be adequate to cover for a reasonable period of time any losses and expenses larger than those predicted and any de-

clines in asset values, including all chance variations in the crucial factors of the operation. Any surplus beyond this cover is 'surplus surplus' which, by definition, is unneeded; it may be treated quite differently in the process of regulation." State of New York Insurance Department, Report of the Special Committee on Insurance Holding Companies at 43 (Feb. 15, 1968) (hereinafter referred to as Insurance Department Report).

Simply put, surplus surplus is the highly liquid assets of an insurance company which can be utilized in non-regulated enterprises. While the importance of the concept has only recently received full recognition the idea is not new; it was previously referred to as "redundant capital."

Insurance companies are not generally permitted to engage in non-insurance business activities. If, therefore, surplus surplus is to be of any practical use it must be separated from the insurance operation with its concomitant regulatory restrictions.

In 1967 Carter, Berlind & Weill undertook a study of fire and casualty companies. The result was a report by Edward Netter submitted in August 1967. It develops the concept of "The Financial Services Holding Company," envisioning modification of the corporate structure of the typical fire and casualty company to permit more flexible utilization of its resources—particularly surplus surplus. Netter postulated a one-stop, comprehensive financial institution servicing virtually all of the consumer's financial needs. Aggressive use of capital redundancy (surplus surplus) was a critical element in Netter's analysis. He estimated Reliance's capital redundancy at $80,000,000 as of December 31, 1966.

Leasco's interest was aroused by the Netter Report. Michael Gibbs, Leasco's Vice President for Corporate Planning, subsequently prepared a "Confidential Analysis Of A Fire And Casualty Company" based "to a large extent" on Reliance. He worked from the Netter Report to illustrate the specific benefits to Leasco of increased earnings per share and leverage potential in acquiring and reorganizing a fire and casualty company with large surplus surplus. His initial idea was to establish a parent holding company to which the fire and casualty company (Reliance) could transfer its surplus surplus—freeing it from regulatory restriction—while continuing to operate as an insurance subsidiary. In his opinion such an acquisition was potentially extremely valuable to Leasco. As he noted:

"II. SPECIFIC ADVANTAGES
FOR LEASCO

If Leasco could acquire control of an F & C * * * (3) large sums of capital for computer leasing would be available, (4) an aggressive acquisition and investment company (the holding company) would initially have a large sum of available capital in addition to potential debt leverage. * * (6) Leasco can create a true financial services company."

Gibbs estimated Reliance's surplus surplus at $125,000,000 as of June 30, 1967 or $100,000,000 as of the end of 1967.

These two documents, along with the Insurance Department Report, provided the impetus for Leasco's take-over bid. Steinberg considered surplus surplus "important to Leasco" and A. Addison Roberts, Reliance's President, came away from negotiations with the impression that "one important aspect of Reliance that commended itself to Leasco was Reliance's surplus surplus." Leasco protected its interest in the surplus surplus by including a provision in an August 1, 1968 agreement with Reliance requiring its management to provide the maximum amount then available to the holding company Leasco would form.

B. *Disclosures Concerning
Surplus Surplus*

The only statements in the prospectus with regard to surplus surplus appears on page five. It neither mentions the amounts that Leasco's management had

in mind nor suggests the importance of Reliance's possible surplus surplus. It reads:

"The Company [Leasco] believes that this Exchange Offer is consistent with the announced intention of the Reliance management to form a holding company to become the parent of Reliance. That intention was communicated to Reliance stockholders on May 15, 1968 by A. Addison Roberts, the president of Reliance, who wrote that the holding company concept would serve the interests of Reliance and all its stockholders 'by providing more flexible operations, freedom of diversification and opportunities for more profitable utilization of financial resources.' The Company supports those objectives and intends to do all it can to promote their realization as soon as practicable. * * * Reliance will diligently pursue its previously announced intention to form a holding company which Reliance will provide with the maximum amount of funds legally available which is consistent with Reliance's present level of net premium volume. * * * "

### C. *Parties' Contentions With Regard To Surplus Surplus*

Plaintiff contends that anything as important to the overall transaction as the amount of surplus surplus should have been disclosed by some sort of approximation. He asserts that such a computation could, in fact, have been made by the techniques used by Netter and Gibbs with information in Leasco's possession or that sufficient additional data could have been obtained to arrive at a reliable estimate. He further claims that while Leasco disclosed its intention to form a holding company to make use of Reliance's resources, it should also have disclosed that Leasco was considering other plans for separating surplus surplus from the insurance operation by reorganization and liquidation of Reliance or by declaration of a special dividend.

Defendants, in contrast, maintain that such omissions were not material because

" * * * the stockholders who exchanged Reliance shares for the Leasco package would not have been deterred from doing so by an estimate of surplus surplus, but rather would have been made all the more anxious to tender."

This belief stems from their perception that a large block of liquid assets in the hands of an aggressive acquisition-oriented company like Leasco would have made the Leasco package even more attractive than Reliance shares. They also assert that such an inclusion would have been "bullish" in violation of SEC standards—it would have made the prospectus a selling document.

Defendants' second principal argument is that surplus surplus could not have been calculated by Leasco because an accurate estimate required (1) access to Reliance's financial data, (2) the judgment of its management, and (3) the opinion of the insurance commissioner, all of which were denied Leasco by the hostility of Reliance's management and its attempts to obstruct the take-over bid.

Finally, defendants contend that any other proposals for removing surplus surplus from Reliance were simply matters being considered by counsel. They never reached the level of a specific plan by Leasco during the pendency of the exchange offer.

### D. *Computation of Surplus Surplus*

The problem and the variety of methods of determining surplus surplus were discussed in the New York Insurance Department Report in the context of how an insurance department should determine what is "required surplus." A variety of techniques were set out:

"The 'required surplus', which should be assured by regulation, is easy to state in the abstract, but difficult to implement in practice. It calls for analysis of the variables that the sur-

plus to policyholders is expected to cover. Essentially they are three. First the surplus must absorb any basic insurance costs (losses and expenses) which are in excess of the premiums charged. Second, the surplus must absorb any under-valuation of loss or claim reserves. Third, the surplus must absorb any declines in asset values. To this should be added any surplus required to finance necessary growth.

\* \* \* \* \* \*

"Well-known rules-of-thumb for making approximations have been developed. The so-called 'two-to-one' rule constitutes an approximation to the specification of required surplus, and can be applied in the absence of anything better. Under most circumstances it is surely too stringent when used as a test of solidity. The rule is based on a theory developed by a former New York Insurance Department Chief Examiner and was utilized in the first draft of the 1939 Recodification of the Insurance Law as a yardstick for payment of dividends.

"A similarly rough, but probably much too liberal, approximation is found in the English statutes. A non-life insurer must have a surplus of at least £50,000 if the general premium income of the company in the previous year did not exceed £250,000, a fifth of that income if it exceeded £250,000 but not £2,500,000, or the aggregate of £500,000 and a tenth of the amount by which that income exceeded £2,500,000.

"The insurance regulatory personnel of some states have concluded that premium writings of three times policyholders' surplus is safe but that four times is risky. Sometimes this is made a little more sophisticated by adding common stock investments to premium writings, in recognition of the fact that surplus must cover not only bad operational experience but also a stock market decline. In actual administration in a department as competent as New York's actual application can be still more refined and

discriminating, though New York, like the others, relies more on judgment than on precise quantitative standards."

The difficulties set out by the New York Insurance Department Report were also perceived as realistic problems by the insurance industry. Roberts, President of Reliance, and a cooperative witness of defendants was of the opinion that what needed consideration was: (1) the relationship of premium writings to surplus; (2) underwriting results; (3) investment policy of the company; (4) its re-insurance arrangements or treaties; (5) exposure to catastrophies; (6) adequacy of loss and premium reserves; (7) quality and characteristics of the agency plan or company; and (8) the quality of management. He indicated that some of the data pertaining to these criteria were not matters of public record.

He concluded that the evaluation of these factors was largely a matter of judgment and nearly impossible without full access to company data.

Similarly, Steinberg, Chief Executive Officer of Leasco, considered the rules of thumb method discussed by the Insurance Department Report and used in both the Netter and Gibbs memoranda to be "unreliable" methods of determining surplus surplus given the lack of access to Reliance management. Consequently, he considered the estimates contained in these documents to be inaccurate and undependable. He testified that he himself had never arrived at an estimate he considered accurate with any degree of certainty throughout the preliminary stages and even through the exchange offer period. Thus, he stated, when the question of including such an estimate in the prospectus arose it was decided on the advice of counsel not to include one.

According to defendants, the result of this pervasive feeling of uncertainty about the accuracy of the estimates put forward by Netter and Gibbs, or any estimate, was that none of the principals in the exchange offer ever calculated sur-

plus surplus, commissioned anyone to compute it, or even attempted to estimate it. Nor did the underwriters attempt at any time to obtain an estimate from Reliance. In fact, they did not even communicate with Reliance.

This is not to suggest that no estimate of surplus surplus was available to Leasco during the negotiations and exchange offer period—the Netter Report had estimated it at $80 million and Gibbs had indicated $100 and $125 million as his approximations. A range of $50–$125 million was discussed at meetings between Reliance and Leasco in October 1968. Leasco simply, according to defendants' testimony, considered these estimates speculative in light of their then state of knowledge of Reliance.

Nor should it be inferred that an estimate could not have been obtained at least by Roberts, who was, of course, privy to Reliance's data. He stated bluntly that he could have made such a calculation "damn quickly" if given a reason to do it. He had not calculated it because he was never presented with a specific need to do so. No one from either Leasco or the underwriters ever asked him to calculate surplus surplus during the pendency of the exchange offer, but he *could* have done so if asked. Whether he *might* or *would* have is one of the subsidiary issues in this litigation.

## IV. BACKGROUND OF THE EXCHANGE OFFER

### A. *January to August 1, 1968.*

Following the submission of the Gibbs memorandum on January 11, 1968, Leasco developed an active interest in acquiring Reliance. By April 3rd of that year it had taken a substantial position in Reliance stock—132,000 shares, roughly 3%, worth over four million dollars.

As early as February 9, 1968 Roberts received word from a partner in a Philadelphia brokerage firm that Leasco was interested in buying Reliance. Accordingly, he sent a letter to his stockholders on May 15, 1968 indicating that Reliance intended to form a holding company to become the parent company of Reliance. This would benefit Reliance and its stockholders " * * * by providing more flexible operations, freedom of diversification and opportunities for more profitable utilization of financial resources through the Holding Company concept." While this document implies recognition of surplus surplus and indicates an intention to aggressively utilize it, the term itself was not used nor did Roberts calculate it because "[t]his was more or less a public relations maneuver" to demonstrate Reliance's progressive attitude and forestall a takeover bid. This letter was subsequently referred to by Leasco on page five of its prospectus, quoted above.

Representatives of Leasco and Reliance met in early June, 1968 to discuss the possibility of a merger between the two companies. Steinberg tried to convince Roberts of the potential for creating new opportunities in the financial service company area. He believed that a merger of a sound insurance company with a company like Leasco which had a strong technological base "would make an exciting combination." Reliance was not particularly interested in the prospect, but Roberts said he would present any specific proposal to his board; none was suggested at that time. Because of the general nature of these discussions, surplus surplus was never specifically discussed and apparently no calculations were made.

Leasco announced a tender offer for Reliance shares on June 22, 1968. At that time it offered one convertible debenture having a principal amount of $110 and paying annual interest of $4.00 and one warrant for every two Reliance shares tendered. The Reliance management wrote to its shareholders on June 24, advising them not to act in haste with regard to the offer.

Hodes, a member of Leasco's board and a partner in its counsel's law firm, by telegram dated June 24, 1968 requested Reliance's cooperation in the preparation of a registration statement on SEC Form S–1 in conjunction with

the registration of the Leasco shares into which the debentures were convertible and promised to promptly furnish Reliance with proofs of the registration statement for its comments. Roberts replied, by telegram dated July 1, 1968, that:

" * * * the Reliance Executive and Finance Committee is studying Leasco's proposal. Reliance cannot incur the expense and potential liability of preparing and supplying the information requested until the Board of Directors has determined whether the Leasco proposal is in the best interests of Reliance and its stockholders."

A copy of the preliminary registration statement filed with the SEC on July 8, 1968 was sent to Roberts on July 9, along with a request for advice as to its accuracy. Similarly, a copy of an actuarial consultant's report on Reliance was forwarded to Reliance with a request for comments on July 12. Roberts responded on July 15 that "[w]e are studying the requests made in your letter of July 9th and will advise you in due course." Reliance apparently never complied with these requests for information.

During the greater part of July the posture of the Reliance officers toward the exchange offer and Leasco was one of hostility, apparently motivated by the conviction that the offer was not in the best interests of Reliance and its shareholders and further by its concern with regard to Leasco's intentions toward them personally should the offer succeed.

Speaking of the first meeting between Leasco and Reliance in June, Roberts testified: "I was less than friendly about it because I was not interested, and they were pursuing it rather vigorously." He similarly characterized a subsequent meeting held in Philadelphia in late July:

" * * * [T]he discussion was about whether we can make an amicable arrangement, an affiliate [sic] or merger, and *discussion was rather abrasive*. I guess I was the leading

character in that respect." (emphasis added).

Perhaps the best expression of this relationship was provided at trial by Saul Steinberg:

"It is somewhat hard for me to characterize it, but, I think that Mr. Roberts viewed—he constantly has characterized this as he was a king and we were about to make him a baron, and the relationship was always on a personal basis, cordial, but I think that I certainly had a lot of respect for him and I still do * * *—but *it was cold*. It * * * wasn't friendly, we were taking over his company." (emphasis added).

Reliance filed a lawsuit against Leasco in mid-July, the purpose being "to inhibit the tender offer." Subsequently, on July 23, 1968, Roberts wrote a strong letter to his shareholders expressing opposition to the proposed exchange offer:

"Your Board of Directors has very carefully weighed the pros and cons of the Leasco offer in the preliminary prospectus and *strongly recommends that you reject* the proposed exchange of Leasco Debentures and Warrants for your Reliance Stock." (emphasis in original).

He listed the following as the reasons for not tendering: (1) the exchange was a taxable transaction; (2) Leasco was small and was spending large fees on the exchange offer itself; (3) the debentures would be subordinated to other debts; (4) Reliance stockholders would be contributing a disproportionate share of earnings and assets in the combined company; (5) Leasco common stock had never paid a dividend; (6) the debentures and warrants had no voting power; (7) any tender was irrevocable and eliminated the Reliance shareholder's ability to take advantage of favorable market changes during the exchange period; and (8) if earnings were to drop off the highly leveraged capitalization of Leasco might cause "financial stringencies."

Indicating that the Board of Directors did not believe Leasco's long term pros-

pects were as good as its high price-earnings ratio would suggest, he summed up management's position:

"[W]e are recommending that you do not accept the Leasco paper. The other alternatives presently available are that you hold your investment or sell your shares on the open market."

This document is particularly significant because of the insight it provides regarding the depth of opposition to the exchange offer as late as July 23. Viewed in conjunction with the failure to provide information and the filing of the law suit, it is clear that Roberts' group was prepared to employ a full panoply of defensive techniques in an attempt to bust the exchange offer. Such resolve in late July becomes crucial in light of conduct on and after August 1, 1968.

The final paragraph of the July 23 letter relates directly to the problem of the alleged omissions to state an amount of surplus surplus. Reliance management informed its shareholders that Leasco might not be the only possible tenderor and impliedly suggested that they not accept the first offer made.

"In considering these alternatives you should know that in the last several weeks Reliance management has negotiated with several other companies and has received a number of offers. In the judgment of your Board, all of these were, like Leasco's proposal, not sufficiently attractive to warrant recommendation to you at this time. We are continuing to have talks with several other interested companies and your management promises to take all possible steps to consummate an affiliation with an investment quality company and insure that your long term investment remains sound, secure and profitable."

In short, they implied a better deal if the tender offer were frustrated.

This promise to actively seek an alliance was made more credible by the fact that the Netter report had been distributed on Wall Street so that the attractiveness of fire and casualty companies was known to security analysts. Roberts' testimony was that many of his shareholders believed that the company was "going to be raided"; he was aware as early as May, 1968 that "many mutual funds were buying this stock" in anticipation of takeover bids.

Shortly after this letter was sent to Reliance shareholders, its management once again met with Leasco to discuss a possible affiliation or merger. It was this meeting which was described as "abrasive" by Roberts. It accomplished nothing and the relationship between the two apparently did not improve until later in July when representatives of Leasco and Reliance met. They worked out the substance of an agreement which modified the offer somewhat and gave Reliance management very substantial personal benefits in exchange for withdrawal of active opposition to the exchange offer and assurances of cooperation in setting up a holding company. The results of these discussions were confirmed in a contract executed August 1, 1968.

#### B. *August 1 to August 19, 1968.*

The August 1st agreement represents the end of open hostility, tacit acceptance of a Leasco takeover, and at least the beginning of a rapprochement between the two management groups. Thereafter, an effective working relationship commenced between what was to be parent and subsidiary. While the personal relationships may not have warmed immediately, the business associations improved considerably to the point that Reliance's management "cooperated with them within reason" after around mid-September and actively after October 18, 1968.

The avowed purpose of entering into the August 1st agreement was that "Reliance has heretofore expressed opposition to Leasco's proposed Exchange Offer, and * * * Leasco desires that Reliance withdraw such opposition". Leasco agreed that if it should acquire a majority of Reliance shares it would

nevertheless vote its shares for at least five years to maintain a majority of the existing Reliance Board of Directors. It bound itself not to elect more than one-third plus one of the directors of Reliance. In effect it reposed a voting trust in the old management.

Roberts was guaranteed his position as director and chief executive officer of Reliance. His associates covenanted to cooperate in setting up a holding company to release from insurance operations "the maximum amount of funds available"—i. e., Reliance's surplus surplus.

As is apparent, a primary function of the agreement was to protect Leasco's interest in Reliance's surplus surplus. Because the voting trust arrangement denied Leasco day-to-day control of Reliance for five years, it required that Roberts and his associates do nothing to diminish profitability and thus limit its financial resources and that they form a holding company to make the maximum amount of surplus surplus available to the Leasco controlled holding company.

The contract protected Reliance management from liability arising from the tender offer itself:

> "Nothing contained herein shall be deemed to require Reliance or its management or the stockholders to recommend to the stockholders of Reliance that they accept the Exchange Offer or to oblige Reliance to cooperate in the preparation of any Registration Statement in connection therewith or to assume or take any liabilities or responsibility in connection therewith."

While Roberts was willing to withdraw his opposition and even cooperate, he clearly did not wish to incur any liability for a registration statement which he was not preparing. He thus avoided any affirmative duty to formally involve himself in the registration process and denied Leasco the use of his name on the registration statement.

The critical significance of this document arises from the assurances it provided the Reliance management that (1) the ordinary insurance business of the company would not be interfered with by non-insurance interests and (2) there would be no major disruption of the prerogatives of Reliance's management team as a result of a successful exchange offer. Thus, the two principal reasons for anxiety and opposition by Reliance officials were resolved favorably.

In addition to the security guaranteed by the August 1, 1968 contract, Roberts reaped a number of substantial personal benefits. His salary was increased from $80,000 to $100,000 a year shortly thereafter. He was granted an option to purchase 5,000 shares of Leasco at 30% of the market price when granted—$27.15 —which he exercised on October 23, 1968 when Leasco shares were selling at $114.-25. Thus, during the pendency of the exchange offer Roberts was the recipient of an $87.10 per share discount, or a bonus of approximately $435,000. He also received a future option on 10,000 additional shares. Finally, he was accorded a position on the Leasco Board of Directors. Roberts took further pains to protect and preserve his own financial well being. He kept his substantial holdings of Reliance shares without tendering. Whatever happened to Reliance shareholders, he was to be well taken care of.

Immediately after the August 1st reconciliation, Reliance withdrew the lawsuit it had filed against Leasco. It mailed its shareholders a letter stating that whether to exchange was a decision they would have to make and indicating that Leasco had increased the offer and granted management a voting trust. Roberts apparently also furnished Leasco with a stockholders list enabling it to transmit the prospectus and formal tender offer.

Prior to the withdrawal of Reliance's opposition Leasco had offered one debenture and one warrant for each two Reliance shares tendered. Leasco finally offered one preferred share and one-half warrant for each share tendered. Whether the final package was in fact

more advantageous than the original offer is not clear. What is clear, however, is that while the original package was taxable to the tenderor on an installment basis only as he realized gain, the final offer was taxable immediately.

The Reliance management group realized the tax disadvantage to the Reliance shareholders, who might have to pay tax on the exchange before receiving any proceeds with which to pay it. Nevertheless, it dutifully maintained the neutrality bargained and paid for in the August 1st contract. Having accepted the imminent takeover on August 1st, Roberts was no longer concerned with details such as tax consequences to his own shareholders to whom he owed a fiduciary duty.

Roberts' withdrawal of opposition, acceptance of Leasco's takeover, and subsequent cooperation during the pendency of the exchange offer, when viewed in light of his own poor opinion of the package offered, provides important insight into the state of his mind—an issue critical to defendants' contention that he would not have cooperated in helping compute surplus surplus. True to his own evaluation of the merits of the Leasco exchange offer, Roberts refused to tender his own shares. It is clear that the neutral posture taken by Roberts after August 1, 1968 was not that of an elected corporate officer who believed that the exchange offer was necessarily in the best interests of his shareholders, but rather the stance of a pragmatic business man who perceived that a tender of shares at a premium over market price was likely to be successful and that it was better to acquiesce—advancing his personal fortune in the process—than to incur the displeasure of the raiders.

Roberts also made it clear that nothing occurred between July 23, and August 1, to change any of the eight specific reasons stated in his letter of opposition dated July 23. The August 1st agreement did not make these factors any less compelling.

Shortly after the August 1st agreement was consummated, a revealing exchange of letters occurred between the Deputy Insurance Commissioner of Pennsylvania and Roberts. On August 2nd the Deputy Commissioner inquired about the Leasco takeover, the existence and extent of surplus surplus, and the position of Reliance's management on the takeover and its future course of action.

Roberts' reply on August 6th expressed the belief that the activity in Reliance stock foretold a takeover bid and that " * * * the rumors had turned into reality in that we were receiving calls from companies interested in acquiring Reliance, commencing several months ago." He further stated that in his opinion Reliance did have surplus surplus which could be removed from the insurance operation but that it was very "difficult to measure with exactness"—a somewhat disingenuous reply in view of his testimony at the trial that he could have computed it quickly. Most revealing, however, is his attitude toward the Leasco exchange offer.

"The Reliance management did not seek the affiliation with Leasco. In fact, our Board of Directors much preferred that our Company not be owned by non-insurance interests; however, in the light of what has taken place we have accepted the fact that Leasco will probably obtain control of the Company. If so, we have agreed * * *

"(b) That Leasco will receive our cooperation in forming a holding company with their having the right to withdraw any surplus funds of Reliance within the framework of satisfying the regulatory authorities that sufficient funds are kept in the business for it to be operated with at least its present premium income.

* * * * * *

"If the answers to these questions are not sufficient for your purpose, will you please advise us as we will be very happy to elaborate on any points or

questions you might wish to present to us."

At this date Roberts still had not expressed in writing a specific opinion regarding surplus surplus. He had, however, indicated his resignation to the Leasco takeover, his intention to cooperate with Leasco, and his willingness to answer any inquiry by the insurance department regarding surplus surplus and its disposition. Roberts' state of mind reflected that of other members of the Reliance board as of August 19, 1968 when the Leasco registration statement became effective and the exchange offer commenced.

### C. *The Exchange Offer Period— August 19, to November 1, 1968.*

The exchange offer was so successful in the early days that by September 13, 72% of the shares had been tendered and Leasco had acquired control. The offer was extended for the second time on September 16, with a supplement to the prospectus indicating the success of the takeover. Between August 1, and mid-September, Roberts had, according to defendants' testimony, not been in direct contact with Leasco as he awaited the outcome of the exchange offer. But as it became certain that Leasco would be his employer, he abandoned his neutral stance.

"Q Now then, Mr. Roberts, during the changeover period, you and other members of Reliance's management team cooperated with Leasco, did you not?

"A Well, let's put it this way, August the first we stopped opposition of keeping the agreement [sic]. The next time I talked to people from Leasco or anyone in the Reliance management to my knowledge, there may have been other talks but I am not aware of them, the first time I did was the middle of December [sic] [September], when Leasco got control of over 80% of the stock. From that time we cooperated with them within reason.

"Q * * * you and the management team cooperated in good faith after mid-September of 1968?

"A That's correct."

The exchange offer was extended four more times. As Roberts became more accustomed to the takeover his cooperation "within reason" became "active cooperation" by October 18—the date of the last extension.

On that date Roberts himself mailed a letter to the remaining Reliance shareholders describing the exchange offer, indicating the recent performance of Leasco securities on the market, and informing them that Leasco intended to declare a dividend of 48 cents on December 1, 1968 which they would not receive if they did not tender by November 1st. He concluded:

"Although the Reliance management makes no recommendation as to the Leasco Exchange Offer, we do wish to point out that in view of Leasco's having over 90% of the Reliance stock, you will be a minority stockholder if you retain the Reliance stock. We strongly recommend that you reconsider you position and consult your financial advisor or broker as to whether you should accept the Leasco offer or take other possible courses of action."

Roberts purpose in writing this letter was admittedly to induce intransigent stockholders to tender their shares— though, as already noted, he himself never tendered.

During the exchange period discussions were carried on between Hodes, Leasco's counsel, and Peter Korsan, counsel for Reliance, regarding methods of ultimately separating Reliance from its surplus surplus, and, if possible, effecting a tax savings for Leasco. Roberts was aware of these discussions. In the course of these meetings a range of $50–$125 million of surplus surplus was discussed. The figure was, however, apparently not Korsan's. During this period each of the principals was conducting an independent legal and factual investigation of reorganization schemes,

holding company concepts, and tax consequences to Leasco. In at least one instance Korsan had discussions with the general counsel for the Pennsylvania Insurance Department in connection with formation of a holding company. In a memorandum to Roberts dated September 27, 1968 Korsan estimated the maximum surplus which could be distributed to a holding company by way of dividend under Pennsylvania law would be $125 million, but Leasco was not, according to defendants' testimony, made privy to this estimate.

So far as relevant to this litigation, the major Leasco concern during this tender period was how Reliance might be reorganized to accomplish tax savings. While several legal variations were explored during September and October they remained merely matters for consideration by counsel and never rose to the level of corporate plans.

Plaintiff, Dudley Feit, tendered his shares on October 14, 1968—long after it was clear that the tender offer would be successful and after Roberts and his associate Korsan were actively cooperating with Leasco. At no time was the discussion of surplus surplus in the prospectus changed, despite the fact that a number of supplements were issued. The exchange offer terminated on November 1, 1968.

## V. THE POST EXCHANGE OFFER PERIOD

After November 1, both management teams continued their studies of alternatives for reorganizing Reliance. Korsan met with a representative of the Insurance Department on November 14 and discussed a range of surplus surplus. On December 20, 1968, however, the Insurance Department was as yet uncertain as to how determination of surplus surplus related to actuarial studies. Reliance had not obtained approval for separation of a specific amount.

### A. *The January 1969 Registration Statement*

Highly significant with respect to Leasco's claims that it could give no esti-mate of surplus surplus was the fact that it did just that a few months after the tender period ended. It did so with no more data than it had during the exchange offer period.

Leasco filed a Form S–1 Registration Statement with the SEC on January 31, 1969 with a prospectus dated February 3, 1969. This registered various securities to be issued in the future among which were the common shares which could be obtained upon exercise of the warrants contained in the exchange package. The prospectus quite properly discussed Leasco's recently acquired insurance business and the plan for reorganizing Reliance to Leasco's benefit:

> "Reliance and the Company are in the process of seeking to cause a reorganization of Reliance, subject to regulatory approvals, the effect of which will be to eliminate minority interests and to make available to the Company, for use in its various business and acquisition activities, *approximately $125,-000,000 of excess surplus of Reliance. It is the opinion of Leasco that this amount represents funds which Reliance has on hand in excess of the legal requirements of its business.* No assurance can be given that such excess funds will ultimately be made available to the Company in such amount or that if so made available that such funds will be profitably utilized by the Company." (emphasis added).

This paragraph was also included in a draft of a preliminary prospectus prepared in June of 1969, but never made effective.

Barely three months after the termination of the exchange offer when Leasco sought to sell its own shares, rather than acquire Reliance's, it included the type of qualified approximation of surplus surplus which plaintiff contends was material to the August 19, 1968 exchange offer. Leasco's lawyer, Hodes, sought to justify this surprising change in position by testifying that the inclusion resulted from the development of a "decent working relationship." He further testified that this new relationship had

conferred previously denied access to Reliance and the Insurance Commissioner and that both were consulted before including the estimates.

The Court has concluded, however, that Hodes' recollection is not accurate. Roberts was not consulted. He acquiesced after the paragraph on surplus surplus had been written by the same Leasco personnel who had participated in drafting the exchange offer prospectus. Roberts' deposition on the point was, at best, equivocal:

"Q Who brought up the subject of surplus-surplus?

A As I recall, I became aware of it because there was a $125 million figure put in the prospectus.

Q What did you say about this?

A I asked where the figure came from.

Q Who did you ask?

A One of the people who was working on the prospectus.

'Q What did they say?

A I don't recall that they had any definite answer. Maybe it came from Mike Gibbs. I don't know. Nobody knew. They haven't asked me about it. That's why I was rather curious."

It is clear that the Insurance Commissioner had not been consulted about the use of this $125,000,000 figure.

## VI. THE DEALER MANAGERS' ROLE

The dealer managers, White, Weld & Co. and Lehman Brothers, played a somewhat limited role in the exchange offer. Leasco's attorneys accepted primary responsibility for preparation of the registration statement with the brokerage houses performing only the "due diligence" function. This function as described by representatives of the firms —Fred D. Stone of White, Weld and Sidney Kahn of Lehman Brothers—included a line by line review of the prospectus accompanied by demands for documentation of particular statements included in the draft by Leasco as well as independent investigation of books and records. These "due diligence" meetings were held on June 28 and 29 and July 1, 2, 3, and 5, 1968 at Leasco's attorney's office in New York.

White, Weld and Lehman are not precisely in pari materia in this case. White, Weld had representation on Leasco's board after June 17, 1968 and had participated in four prior offerings by Leasco, while this was Lehman's first experience with Leasco.

White, Weld had accumulated data gathered as part of the prior offerings. They thoroughly reviewed Leasco's audit statements with Leasco's accountant, Touche, Ross & Company. They also examined the report of an actuary firm hired to examine Reliance.

With regard to surplus surplus, Stone, for White, Weld, was well informed. As early as 1965 he worked with the concept —then known as "redundant capital"— in conjunction with staving off a tender offer and later, in 1968, he participated in forming a holding company. He received the Netter Report and the Gibbs Memorandum in January or February of 1968 and requested a copy of the New York Insurance Department Report sometime after June 22. When Leasco raised the question of including an estimate of surplus surplus, he concluded that surplus surplus could not be computed accurately because there was no factual basis for such a computation in the absence of access to Reliance's management and the insurance commissioner.

Stone had in mind Leasco's requests for information and the lack of response when he gave this opinion. He was at no time disabused of the notion that Reliance would not provide data to assist in an approximation of surplus surplus. Since, based on his own experience, he had high regard for the competence of both Leasco's representatives and its law firm, there was no reason for him to suspect that they would be withholding relevant information. For this reason he relied on their representation, implied

and actual, that the situations with regard to access to Reliance management remained unchanged. This accorded with his usual practice of relying upon the issuer or its counsel to produce relevant material from its files rather than to personally inquire into corporate developments such as negotiations between target and acquiring companies. Consequently, he made no effort to directly contact either Reliance or the Pennsylvania Insurance Commissioner about surplus surplus.

Counsel for the dealer managers, Bell, Boyd, Lloyd, Haddad & Burns of Chicago, examined the corporate records of Leasco, its corporate minutes, director actions and basic contracts. Jack M. Whitney, II, a former SEC Commissioner, was the lawyer primarily in charge of the dealer manager's duties. He participated in the extensive "due diligence meetings" conducted in New York where the preliminary prospectus was examined. When the subject of Reliance's intention to form a holding company arose during these meetings Whitney became involved in a discussion of surplus surplus. He was admittedly uninformed about the concept and those present at the meeting, particularly Stone of White, Weld, undertook to edify him. Following intensive exploration of the concept and the limitations inherent in attempting to approximate it, he rendered an opinion that an estimate could not properly be included in the prospectus.

On August 13, 1968—barely six days before the registration statement became effective—Whitney received yet further confirmation of his opinion of July in the form of a copy of a letter from Wilkie, Farr & Gallagher to the SEC. It reads:

> "Certified financial statements of Reliance Insurance Company are not included in the Amendment since *that company has continued to refuse to cooperate* in the making of the Exchange Offer. Although the Reliance Insurance Company management is not actively opposing the Exchange Offer they have expressly declined to support or recommend it and have accordingly

declined to furnish information in connection with this Registration Statement." (Emphasis supplied.)

On August 21 and September 18, 1969, Whitney sent a written favorable opinion to the dealer managers regarding the accuracy and completeness of the registration which became effective August 19, 1968.

The position of the dealer-managers that surplus surplus should not be estimated was, the Court concludes, based upon information furnished by Leasco that Reliance continued to refuse to cooperate. This was not true. Roberts and Reliance had not been asked to confirm estimates after August 1st when the probabilities of a successful takeover became increasingly great. But the dealer-managers were not aware that such cooperation was available.

## VII. THE SECURITIES STATUTES

Plaintiff seeks relief under three separate sections of the 1933 Securities Act. Section 11 creates civil liability for material misstatements and omissions contained in a registration statement. 15 U.S.C. § 77k. Section 12(2) imposes civil liability on a seller who uses such misrepresentations in any sale whether or not by registration statement. 15 U.S.C. § 77l(2). Section 17(a) makes it unlawful to sell securities by the use of an "untrue statement of a material fact" or any omission of a material fact (15 U.S. C. § 77q(a); civil liability is arguably also available to an injured buyer under this section, but the issue has not been definitely resolved. *See* Globus v. Law Research Service, 418 F.2d 1276, 1283–1284 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); VI L. Loss, Securities Regulation 3913–3914 (1969).

Plaintiff also asserts that the Securities Exchange Act of 1934 provides relief under both Section 10(b)—pursuant to Rule X–10b–5—and Section 14(e). 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5; 15 U.S.C. § 78n(e). The former makes it unlawful "to make any untrue statement of a material fact" in connection with the

purchase or sale of "any security", while the latter creates the same illegality "in connection with any tender offer or request or invitation for tenders." Civil liability has been established for violation of Rule 10b–5. *See* SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom, Coates v. SEC & Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (liability under Rule 10b–5); Fischman v. Raytheon, 188 F.2d 783 (2d Cir. 1951) (establishes civil remedy under Rule 10b–5). It also can be based on Section 14(e). *See* Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (Section 14(a) and Rule 14a–9 use the same operative language found in Section 14(e)); J. I. Case v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (same).

The case before us involves misrepresentations included in a registration statement. While liability might well lie under the other broader provisions urged by plaintiff, we will focus on Section 11. It deals exclusively with registration statements such as the one before us. Before turning to our discussion of Section 11 a few comments on the disclosure philosophy of the federal securities laws are necessary in order to establish the setting in which the requirements of Section 11 must be applied.

## VIII. DISCLOSURE

### A. *Disclosure Policy*

The keystone of the Securities Act of 1933, and of the entire legislative scheme of the securities laws, is disclosure. Knauss, A Reappraisal of the Role of Disclosure, 62 Mich.L.Rev. 607 (1964). The 1933 Act is almost exclusively preoccupied with accurate disclosure of facts, favorable and unfavorable. Folk, Civil Liabilities Under the Federal Securities Acts: The BarChris Case, 1 Securities L.Rev. 3, 13, 16–17 (1969) (reprinted from 55 Va.L.Rev. 1 (1969)). "All the Act pretends to do is to require the 'truth about securities' at the time of issue". Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171 (1933). *See also* F. Wheat, Disclosure to Investors 10, 46 (1969) (hereinafter referred to as The Wheat Report); Comment, BarChris: Due Diligence Refined, 68 Colum.L.Rev. 1411 (1968).

"The emphasis on disclosure rests on two considerations. One relates to the proper function of Federal government to investment matters. Apart from the prevention of fraud and manipulation, the draftsmen of the '33 and '34 Acts viewed that responsibility as being primarily one of seeing to it that investors and speculators had access to enough information to enable them to arrive at their own rational decisions. The other, less direct, rests on the belief that appropriate publicity tends to deter questionable practices and to elevate standards of business conduct." The Wheat Report at 10.

*See* Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 172 (1933).

A primary objective is to place potential securities purchasers on a parity with their vendors to the extent practicable. Folk, Civil Liabilities Under the Federal Securities Acts: The BarChris Case, 1 Securities L.Rev. 3, 20 (1969) (reprinted from 55 Va.L.Rev. 1 (1969)). The Act's "fundamental purpose * * * was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). *See also* In re Investors Management Company, et al., Sec.Exch.Act Release No. 9267, S.E.C. No. 3–1680, memorandum at 6–9 (SEC July 29, 1971). The focus on disclosure reflects the insight gained by experience that without complete, accurate and intelligible information about a company, investors cannot make intelligent investment decisions with regard to its securities. The Wheat Report conceives of the information requirement as an effort to as-

sure the integrity of the free market for securities:

"A classic statement of the purposes of provisions designed to inform the trading markets is found in the report of the House Committee on the '34 Act:

'No investor, no speculator can safely buy and sell securities * * * without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells. The idea of a free and open public market is built upon the theory that competing judgments of buyers or sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just price. Just as artificial manipulation tends to upset the true function of an open market, so the hiding and secreting of important information obstructs the operations of the markets as indices of real value. There cannot be honest markets without honest publicity.' " The Wheat Report at 50.

Another commentator views disclosure as a prerequisite to accurate determination of intrinsic value:

"Because of the nature of securities, a buyer cannot make an immediate value judgment, as he would with tangible items. He must look behind the piece of paper and examine the merits of the company which has issued the security. The buyer must of necessity rely on the information given to him and on material generally available from the company. The less information available, the less the market price will be representative of the security's true value and the greater will be the opportunity for fraud." Knauss, A Reappraisal of the Role of Disclosure, 62 Mich.L.Rev. 607, 610 (1964).

*Cf.* Ratner v. Chemical Bank New York Trust Company, 329 F.Supp. 270, 276 (S.D.N.Y.1971) ("Truth in Lending Act", 15 U.S.C. § 1601 et seq., requires disclosure of interest rates in order "to put the borrower in possession of the pertinent information before the plunge * * * ").

The second—and for our purposes less important—goal of the full disclosure policy is deterrence. This consideration arose from excesses of the 1920's and the havoc subsequently wreaked on investors. The drafters accepted as an article of faith and common sense that if management must bare all on pain of civil and criminal liability its dirty intra-corporate linen will be cleaned before the registration statement is filed. Concomitantly, such disclosure has the prophylactic effect of promoting general business integrity.

"Brandeis, to whom many give credit for being the strongest advocate for full disclosure, also directed his principal fire against the big companies. His famous quotation, 'sunlight is said to be the best of disinfectants; electric light the most efficient policeman,' was made in relation to the amount of underwriting commissions received by J. P. Morgan & Co. for their role in selling securities of major companies." Knauss, A Reappraisal of the Role of Disclosure, 62 Mich.L.Rev. 607, 614 (1964).

*See also* The Wheat Report at 50–51.

### B. *Effective Disclosure*

The ultimate goal of the Securities Act is, of course, investor protection. Effective disclosure is merely a means. The entire legislative scheme can be frustrated by technical compliance with the requirements of the Securities and Exchange Commission's Form S–1 for preparation of registration statements in the absence of any real intent to communicate. It is for this reason that the SEC, through its rule making power, has consistently required "clearly understandable" prospectuses. The Wheat Report at 78.

Unfortunately, the results have not always reflected these efforts. "[E]ven

when an investor [is] presented with an accurate prospectus prior to his purchase, the presentation in most instances tend[s] to discourage reading by all but the most knowledgeable and tenacious." Knauss, A Reappraisal of the Role of Disclosure, 62 Mich.L.Rev. 607, 618–619 (1964). These documents are often drafted so as to be comprehensible to only a minute part of the investing public.

> "There are also the perennial questions of whether prospectuses, once delivered to the intended reader, are readable, and whether they are read. The cynic's answer to both questions is 'No'; the true believer's is 'Yes'; probably a more accurate answer than either would be: 'Yes'—by a relatively small number of professionals or highly sophisticated non-professionals; 'No'—by the great majority of those investors who are not sophisticated and, within the *doctrine of SEC v. Ralston Purina Co.* [346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494], are not 'able to fend for themselves' and most 'need the protection of the Act.'" Cohen, "Truth in Securities" Revisited, 79 Harv.L.Rev. 1340, 1351–1352 (1966).

*See also* The Wheat Report at 77–78.

In at least some instances, what has developed in lieu of the open disclosure envisioned by the Congress is a literary art form calculated to communicate as little of the essential information as possible while exuding an air of total candor. Masters of this medium utilize turgid prose to enshroud the occasional critical revelation in a morass of dull, and—to all but the sophisticates—useless financial and historical data. In the face of such obfuscatory tactics the common or even the moderately well informed investor is almost as much at the mercy of the issuer as was his pre-SEC parent. He cannot by reading the prospectus discern the merit of the offering.

The instant case provides a useful example. Ignoring, for the moment, the alleged omissions which are the subject of the plaintiff's complaint, the passage in which Leasco's intentions with regard to surplus surplus are "disclosed" in the short excerpt set out at page 552, *supra.* This revelation, while probably technically accurate with regard to Leasco's then intentions respecting surplus surplus, was hardly calculated to apprise the owner of shares of Reliance common stock that Reliance held a large pool of cash or near-cash assets which were legally and practically unnecessary for the efficient operation of the insurance business, and that Leasco intended to remove those assets "as soon as practicable." More important, it does not reveal Leasco's estimates of the extent of those assets. A conscientious effort by the issuer and its counsel would have produced a more direct, informative and candid paragraph about Leasco's intended reorganization of Reliance. They might have effectively disclosed, in understandable prose—as they did in January of 1969—the essence of the plan to the shareholders they were soliciting.

## C. *Disclosure to Whom?*

The view that prospectuses should be intelligible to the average small investor as well as the professional analyst, immediately raises the question of what substantive standard of disclosure must be maintained. The legal standard is that all "material" facts must be accurately disclosed. But to whom must the fact have material significance?

In an industry in which there is an unmistakable "trend toward a greater measure of professionalism * * * with the accompanying demand for more information about issuers" "a pragmatic balance must be struck between the needs of the unsophisticated investor and those of the knowledgeable student of finance." The Wheat Report at 9–10. There are three distinct classes of investors who must be informed by the prospectus: (1) the amateur who reads for only the grosser sorts of disclosures; (2) the professional advisor and manager who studies the prospectus closely and makes his decisions based on the insights he

gains from it; and (3) the securities analyst who uses the prospectus as one of many sources in an independent investigation of the issuer.

The proper resolution of the various interests lies in the inclusion of a clearly written narrative statement outlining the major aspects of the offering and particularly speculative elements, as well as detailed financial information which will have meaning only to the expert. Requiring inclusion of such technical data benefits amateurs, as well as experts, because of the advice many small investors receive and the extent to which the market reflects professional judgments. The Wheat Report at 52. Such "[e]xpert sifters, distillers, and weighers are essential for an informed body of investors". Cohen, "Truth in Securities" Revisited, 79 Harv.L.Rev. 1340, 1353 (1966).

Mr. Justice Douglas, then teaching at Yale, commented in 1933 that:

"[T]hose needing investment guidance will receive small comfort from the balance sheets, contracts, or compilation of other data revealed in the registration statement. They either lack the training or intelligence to assimilate them and find them useful, or are so concerned with a speculative profit as to consider them irrelevant. * * * [E]ven though an investor has neither the time, money, nor intelligence to assimilate the mass of information in the registration statement, there will be those who can and who will do so, whenever there is a broad market. The judgment of those experts will be reflected in the market price. Through them investors who seek advice will be able to obtain it." Douglas, Protecting The Investor, 23 Yale Rev. (N.S.) 508, 523–524 (1933) (quoted in The Wheat Report at 53).

The Wheat Report further notes:

"that a fully effective disclosure policy would require the reporting of complicated business facts that would have little meaning for the average investor. Such disclosures reach average inves-

tors through a process of filtration in which intermediaries (brokers, bankers, investment advisors, publishers of investment advisory literature, and occasionally lawyers) play a vital role." The Wheat Report at 52.

"The significance of disclosures which have an initial impact at the professional level has been heightened by recent changes in the securities business. Most important of these is the enormous growth of intermediation in investment. The relative importance of such professional money managers as bank trust departments, pension fund managers, investment counseling firms and investment advisors to mutual funds and other investment companies is greater than ever before." The Wheat Report at 54.

■ The significance of these observations is that the objectives of full disclosure can be fully achieved only by complete revelation of facts which would be material to the sophisticated investor or the securities professional not just the average common shareholder. But, at the same time, the prospectus must not slight the less experienced. They are entitled to have within the four corners of the document an intelligible description of the transaction.

### D. *Enforcement.*

The Securities Act provides a full panoply of enforcement procedures.

A considerable *in terrorem* effect is generated by the SEC's examination of registration statements and its use of orders refusing to permit registration statements to become effective (15 U.S. C. § 77h(b)) and stop orders when uncorrected misrepresentations appear (15 U.S.C. § 77h(d)). "A stop order may not be merely a death warrant for the particular financing; it may also be a severe or even fatal blow to the registrant and, at very least, is likely to touch off the civil liability provisions if securities have been sold." Cohen, "Truth In Securities" Revisited, 79 Harv.L.Rev. 1340, 1355 (1966). Section 20(b) of the 1933

Act authorizes injunctive relief against any person who is about to violate any of the provisions of the Act—in this context anyone who proposes to distribute a prospectus containing material misstatements or omissions. 15 U.S.C. § 77t(b). Furthermore, the Commission may transmit evidence of such violation to the Attorney General for criminal prosecution (15 U.S.C. § 77t(b)) and anyone who wilfully violates the disclosure requirements of the statute or SEC rules is subject to a $5000 fine or five years imprisonment or both. 15 U.S.C. § 77x. "Moreover, the SEC may suspend or expel those who violate the securities acts or suspend trading in a particular stock." Globus v. Law Research Service, 418 F. 2d 1276, 1285 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).

But this power of the SEC to intercede is, as a practical matter, limited to more flagrant misstatements and omissions obvious on the face of the prospectus or from other information at hand. To expect the hard pressed SEC staff to conduct an independent field study of every prospectus is unrealistic. *Cf.* Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 212 (1933).

The civil liability sections of the 1933 Act, when properly applied, act as independent and effective enforcement provisions. A "class action under Fed.R.Civ. P. 23 could be particularly effective and appropriate in remedying violations of the securities acts * * * compensatory damages, especially when multiplied in a class action, have a potent deterrent effect." Globus v. Law Research Service, 418 F.2d 1276, 1285 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). *Cf.* Ratner v. Chemical Bank New York Trust Company, 329 F.Supp. 270, 280 (S.D.N.Y. 1971) (private attorney general in "Truth in Lending Act"). The principal purpose of civil liability in the 1933 Act is, in fact, deterrent rather than compensatory.

"There is a danger in discussing civil liability in connection with the Securities Act that both the purpose of the Act and the emphasis of the discussion will be misunderstood. It is not the object of the Act simply to provide a legal remedy for the investor who has bought securities upon a false representation, to compensate him for a loss incurred. Even the provisions for civil liability are calculated to be largely preventive rather than redressive. Both in the extent of liability imposed —the variety of persons to whom the liability is attached, the bases of the liability, and the persons in whose favor it runs—and in the limitation of the amounts recoverable, the *in terrorem* function of the Act is evidenced. But even this purpose of securing preventive vigilance and caution on the part of the persons concerned is only coordinate with, or probably subordinate to, another object. The Act seeks not only to secure accuracy in the information that is volunteered to investors, but also, and perhaps more especially, to compel the disclosure of significant matters which were heretofore rarely, if ever, disclosed. Civil liability is imposed largely as one appropriate means of accomplishing these ends, not as the end itself, or, on the other hand, as the only means. While, then, discussion of the Act may properly be directed to the different provisions separately, it is apt to be misleading, and more covertly disingenuous, if the principal objectives are not constantly pushed to the front." Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227 (1933).

The Second Circuit has recently adopted this early view of the *in terrorem* function of Section 11:

"Civil liability under section 11 and similar provisions was designed not so much to compensate the defrauded purchaser as to promote enforcement of the Act and to deter negligence by providing a penalty for those who fail in their duties." Globus v. Law Research

Service, 418 F.2d 1276, 1288 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). *See also* III L. Loss, Securities Regulation 1831 (1969); Cohen, "Truth in Securities" Revisited, 79 Harv.L.Rev. 1340, 1355 (1966); Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 173 (1933); Comment, Bar-Chris: Due Diligence Refined, 68 Colum. L.Rev. 1411 (1968).

■ Criminal liability is necessarily predicated on proof of specific intent to violate the Act, while civil liability is established after a showing of failure to exercise reasonable care in preparing registration statements. Only primary reliance on civil liability can protect investors from the "climate of laxity" or "lethargy" which has characterized the preparation of some registration statements. Folk, Civil Liabilities Under the Federal Securities Acts: The BarChris Case, 1 Securities Law Rev. 3, 8–9 (1969) (reprinted from 55 Va.L.Rev. 1 (1969)).

The courts face a dual responsibility when presented with a claim for civil relief. They must adjudicate the particular claim for relief presented by the plaintiff, and simultaneously vindicate the full disclosure policy of the Securities Act for the protection of the entire investing public.

## IX. SECTION 11

Section 11(a) of the Securities Act of 1933 provides for civil liability for misstatements and omissions in a registration statement. 15 U.S.C. § 77k(a). It reads:

"(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—"

### A. The Alleged Omissions

(1) *Failure to Disclose Methods of Reorganization Other Than the Holding Company Concept*

During the exchange offer period several memoranda and letters were exchanged between Hodes, Leasco's counsel, and various other attorneys for Reliance and Leasco. It is apparent that various methods of reorganization were being seriously investigated by a number of attorneys for Leasco and Reliance. Leasco's president, Schwartz, was kept apprised of the progress of these inquiries by Hodes.

■ Despite this research activity, none of these investigations ever crystallized during the exchange offer period sufficiently to be characterized as "plans" of Leasco. They were never presented to the Leasco Board nor were they even discussed in any detail with members of Leasco's management. They were, rather, merely possible alternatives for consideration by counsel. Such preliminary contingency planning need not be included in the prospectus under the circumstances of this case.

(2) *Failure to Include an Estimate of Surplus Surplus*

The failure to include an estimate of surplus surplus raises a more serious question. There is no doubt that Leasco had in its possession at least three estimates of Reliance's surplus surplus— $80,000,000 as of December 31, 1966 contained in the Netter Report and $125,-000,000 or $100,000,000, at June 30th and December 31, 1967 respectively, both approximated in the Gibbs Memorandum. In addition they had available the rules of thumb for calculation contained in the New York Insurance Department Report. Leasco could have used these estimates or commissioned an independent computation based on public information. This figure could have been included with the sort of qualifying statement in-

cluded in the January, 1969 prospectus. Whether the failure to do so places liability on the defendants under Section 11 is the question now presented.

### B. *Materiality.*

Only if the omission complained of is "material" within the meaning of Section 11 can liability be found. The SEC has defined the term by looking to what a reasonably prudent investor reasonably ought to know before buying a security. It reads:

> "The term 'material', when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered." 17 C.F.R. § 230.405(*l*).

Speaking of this definition in one of the few reported Section 11 cases, Judge McLean summed the matter up succinctly by emphasizing the need to know "facts which have an important bearing upon the nature or condition of the issuing corporation or its business." Escott v. BarChris Construction Corp., 283 F. Supp. 643, 681 (S.D.N.Y.1968).

Judge McLean quite properly placed emphasis on the need to disclose those facts which revealed the "condition" of the issuer because the facts omitted in *BarChris* related to the stability of the issuing company and the continuing security of the investment. It is clear, however, that facts other than the condition of the issuer bearing on the value, *qua* price, of the securities in question must be disclosed with the same scrupulousness. The issuer must disclose any fact "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities". Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963) (emphasis added). *See* Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1971); SEC v. Texas Gulf Sulphur, 401 F.2d 833, 849 (2d Cir. 1968), cert. denied

sub nom. Coates v. SEC and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L. Ed.2d 756 (1969); List v. Fashion Park, 340 F.2d 457, 462 (2d Cir.), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 rehearing denied, 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344 (1965). *BarChris* cannot be read as permitting exclusion of important facts merely because they involve the condition of the company being taken over rather than the issuer since these facts will bear on the relative value of the issuer's securities.

Some probability that the investor's decision would be affected by disclosure is a prerequisite to a finding of materiality. The degree of probability that it would have such an impact has been differently stated by the courts. They have focused on the effect on the reasonable purchaser, variously asking whether he "might" or "would" or "might well have been" affected by the information; they have asked whether it is "reasonably certain" that the information would have had a "substantial effect" or whether it "might" have had a "significant propensity" to affect him.

In *List* v. *Fashion Park*, 340 F.2d 457 (2d Cir.), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L. Ed.2d 60, rehearing denied, 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344 (1965), the Second Circuit used the word "would" to suggest the applicable level of probability.

> "The basic test of 'materiality' * * * is whether 'a reasonable man *would* attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" List, *supra* at 462 (quoting from Restatement, Torts § 538(2) (a)) (emphasis added).

> "The proper test is whether the plaintiff *would* have been influenced to act differently * * *." List, *supra* at 463 (emphasis added).

*See* SEC v. Great American Industries, Inc., 407 F.2d 453, 459–460 (2d Cir.

1968), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); III L. Loss, Securities Regulation 1431 (1969). This test implies a fairly high probability.

Subsequently, in the leading case of *SEC* v. *Texas Gulf Sulphur*, 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the Second Circuit used several different verbal formulations of materiality. Discussing an "insider's" obligation to disclose under Rule 10b–5, it indicated that the duty

> "arises only in 'those situations which are essentially extraordinary in nature and which are *reasonably certain to have a substantial effect on the market price* of the security * * *.'"
> SEC v. Texas Gulf Sulphur, *supra* at 848 (emphasis added).

The Court also mentions the tests quoted above from *List* and *Kohler* v. *Kohler*, 319 F.2d 634, 642 (7th Cir. 1963). It shifted from the "would" of *List* to the standard of "may":

> "Thus, material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and *those which may affect the desire of investors to buy, sell, or hold the company's securities.*
>
> "In each case, then, whether facts are material within Rule 10b–5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."
> SEC v. Texas Gulf Sulphur, *supra*, 401 F.2d at 849 (emphasis added).

Discussing materiality in the context of Section 14(a) of the Securities Exchange Act of 1934 the Supreme Court utilized an even less stringent test than *Texas Gulf*, indicating that a "material fact" was one

> "of such a character that it *might have been considered important* by a reasonable shareholder who was in the process of deciding how to vote. This requirement [is] that the defect have a *significant propensity to affect* the voting process * * *" Mills v. Electric Auto-Lite Company, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970) (emphasis added in part).

The use of "propensity" in the context of a proxy situation is particularly significant to the instant case since the Reliance shareholders were, in effect, being asked to "vote" a merger with Leasco by accepting the exchange offer.

Just this year the Second Circuit has once again employed "might" as the applicable standard of probability, further reducing the force of the word by adding to it "well have." Applying the test articulated in *List, Kohler, Texas Gulf Sulphur,* and *Mills* v. *Electric Auto-Lite,* the court held that "the question of materiality becomes whether a reasonable man in [the investor's] position *might well have acted otherwise* than to purchase if he had been informed * * *." Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1971) (emphasis added). The issue, it was said, is whether the disclosure "could well influence" the decision of the investor. *Id.* at 1172. *See also* Gilbert v. Nixon, 429 F.2d 348, 355–356 (10th Cir. 1970); Johns Hopkins University v. Hutton, 422 F.2d 1124, 1128–1129 (4th Cir. 1970); Demarco v. Edens, 390 F.2d 836, 840–841 (2d Cir. 1968).

Most recently the Securities and Exchange Commission indicated that certain information "was material because it 'was of such importance that it *could be expected to affect the judgment* of investors whether to buy, sell or hold * * * stock [and, i]f generally known, * * * to affect materially the market price of the stock.'" In re Investors Management Company, et al., Sec. Exch. Act Release No. 9267, S.E.C. No. 3–1680,

memorandum at 9 (SEC July 29, 1971) (emphasis added).

While these verbal formulations by the courts and the SEC taken individually fail to prescribe a precise standard, they do evince a trend toward broadening the definition of materiality and concomitantly raising the requirement of disclosure where the law requires full disclosure. *Cf.* Wiesen, Disclosure of Inside Information—Materiality and *Texas Gulf Sulphur*, 1 Securities L.Rev. 267, 288–290, 310–311 (1969) (reprinted from 28 Md.L.Rev. 189 (1968)); 2 A. Bromberg, Securities Law; Fraud SEC Rule 10b–5 § 8.3, p. 199 (1970) ("Rule is applied to subtler or milder cases").

Commentators have not been much more successful than the courts in precisely defining the concept of materiality. Thus, an early writer concluded that "a material fact is any piece of information having *fairly predictable* results either on the value of the securities or on the outsider's estimate of that value." Comment, The Prospects for Rule X–10B–5: An Emerging Remedy for Defrauded Investors, 59 Yale L.J. 1120, 1145 (1950) (emphasis added). It was later suggested that materiality "be limited to those situations which are essentially extraordinary in nature and which are *reasonably certain* to have a substantial effect on the market price of the security if disclosed." Fleischer, Securities Trading and Corporate Information Practices: The Implications of the *Texas Gulf Sulphur* Proceeding, 51 Va.L.Rev. 1271, 1289 (1965) (emphasis added).

What is called for is "[s]ome sort of reasonable-man, objective test of investment, judgment, intrinsic value, or (in the case of a publicly traded security) significant market effect". 2 A. Bromberg, Securities Law: Fraud SEC Rule 10b–5 § 8.3, p. 199 (1970).

■■ A fair summary of the rule stated in terms of probability is that a fact is proved to be material when it is more probable than not that a significant number of traders would have wanted to know it before deciding to deal in the security at the time and price in question. What is statistically significant will vary with the legal situation. *Cf.* Rosado v. Wyman, 322 F.Supp. 1173, 1180–1181 (E.D.N.Y.1970), aff'd, 437 F.2d 619 (2d Cir. 1970). Being a formal and legally required document, a prospectus must satisfy a high standard of disclosure—i. e., disclosure is required when only a relatively small percentage of traders would want to know before making a decision. Anything in the order of 10% of either the number of potential traders or those potentially making 10% of the volume of sales would seem to more than suffice.

Putting the test in mathematical terms may, perhaps, be useful in permitting surveys and quantification of results in future litigation. But even if mathematical models buttressed by valid sampling techniques for determining trader reactions were possible and economically feasible in litigations of this sort, no such approach was attempted by the parties in this case.

■■ Since no data except the unpersuasive suppositions of opposing experts were produced at the trial to show how potential traders would have viewed the information at issue, we are forced to analyze the facts in terms of alternative courses of conduct available to a hypothetical reasonably prudent shareholder constructed by the Court. In nonquantitative terms a fact is "material" in a registration statement whenever a rational connection exists between its disclosure and a viable alternative course of action by any appreciable number of investors. Materiality is then a question of fact to be determined in the context of a particular case. *Cf.* SEC v. Texas Gulf Sulphur, 401 F.2d 833, 849 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Escott v. BarChris Construction Corp., 283 F.Supp. 643, 682 (S.D.N.Y.1968); Painter, Inside Information: Growing Pains for the Development of Federal Corporation Law Under Rule 10b–5, 65 Colum. L.Rev. 1361, 1379 (1965); Fleischer, Se-

curities Trading and Corporate Information Practices: The Implications of the *Texas Gulf Sulphur* Proceeding, 51 Va.L.Rev. 1271, 1289–1290 (1965); Ruder, Pitfalls in the Development of a Federal Law of Corporations by Implication Through Rule 10b–5, 59 Nw.U.L.Rev. 185, 195 (1964).

■ The information with respect to the availability of tens of millions of dollars of surplus surplus is so significant that under any test proposed it is material. A substantial percentage of the reasonable persons holding shares of Reliance would want to know what Leasco's estimate and plans were respecting this asset before deciding to exchange on the terms offered. It would be unrealistic to expect an average shareholder of Reliance to know what the surplus surplus position of his company was; no proof was submitted suggesting that he would know this. Leasco did have this information as the result of its own detailed studies which had required a substantial outlay of money and executive time.

According to Steinberg, Reliance's surplus surplus was "important to Leasco" and played a significant part in Leasco's interest in Reliance. Similarly, Roberts came away from his many discussions with Leasco with the distinct impression that "one important aspect of Reliance that commended itself to Leasco was Reliance's surplus surplus."

The size and availability of this resource was so important that Leasco included a clause in the August 1, 1968 contract which was intended to protect Leasco's interest in the surplus surplus after the takeover was consummated. Having relinquished control of the insurance operation for five years, Leasco simply could not afford the risk that the critical objective of the whole deal could be frustrated by a recalcitrant Reliance management.

The significance of this intense interest in surplus surplus is that by failure to disclose the size of the fund Leasco hoped to acquire, it effectively denied the Reliance shareholders knowledge of one of the principal factors underlying the transaction. This insufficiency prevented accurate evaluation of the degree of interest of Leasco. Knowledge of the intensity of demand is essential to determination of a fair price in a market economy.

Failure to disclose the size and nature of such fiscal resources has much the same effect as failure to disclose geological reports indicating undeveloped minerals sources. *Cf.* SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC and Kline. v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

In the absence of an estimate of surplus surplus the Leasco package may have been very attractive, offering as it did a substantial premium over the price of Reliance shares. But with full disclosure the Reliance shareholder might well have reconsidered the value of his shares. Moreover, such disclosure may have motivated the market—influenced as it is by professionals and institutional investors—to revalue the Reliance shares making the Leasco offer relatively less attractive. *See* Wheat Report at 52–54. The consequence of such a reevaluation would be either a refusal to exchange or an upward revision of the exchange offer package by Leasco.

■ Defendants argue that regardless of the importance of such an estimate its disclosure would not have affected the Reliance shareholders' decision to exchange since Leasco was offering such a substantial premium for the Reliance shares that the attractiveness of the offer in cash terms would have overcome any doubts created by knowledge of a substantial amount of surplus surplus. This contention blinks the fact of professional surveillance of Reliance as attested to by Roberts. A substantial possibility exists that the Reliance shares were significantly undervalued in the market because of the general traders' ignorance of the magnitude of the possible surplus surplus. Its disclosure, when subjected to both professional and non-

professional analysis, might well have appreciably reduced or eliminated the premium by raising Reliance's market price. Moreover, mere fairness of the deal is not an excuse not to reveal material facts. *Cf.* Mills v. Electric Auto-Lite Company, 396 U.S. 375, 381–382, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970).

Nor is it speculative to postulate that Reliance shareholders might have chosen to hold their shares in light of Reliance's May 15, 1968 announcement of an intention to form a holding company to more fully utilize its financial resources. That announcement, by itself, may not have induced a reevaluation of the stock, but when dovetailed with a disclosure that something in the order of 100 million dollars might be so used, it would almost certainly have caused at least the professional and a substantial number of non-professional shareholders to consider the effect of such a reorganization on Reliance.

Any second thoughts generated by this information would have been further buttressed by Roberts' letter of July 23, 1968 to his shareholders. He describes in some detail the relative disadvantages of owning Leasco shares. Since the principal attraction in the exchange was the considerable market premium being offered by Leasco, the offer may well have become less desirable, in light of the speculative nature of Leasco securities, if the shareholder knew that the premiums were not as great as had initially appeared.

Thus disclosure of the huge block of under-utilized liquid assets held by Reliance logically opened two reasonable alternatives to accepting the Leasco exchange offer—either to hold the shares in expectation of future Reliance prosperity or to exchange only if Leasco offered a more favorable exchange ratio more accurately reflecting Reliance's true worth. Moreover, it is not improbable that full disclosure of the extent of surplus surplus may have led Reliance shareholders to conclude that a similar interest might have been generated in other aggressive, acquisitive companies, particularly since Roberts had stressed precisely such a possibility in his July 23, letter of opposition previously quoted at pages 555–556, *supra.*

A realization, brought on by disclosure of a huge block of near cash assets, that another tender offer might be in the offing, would have presented at least three possible reasons for not exchanging pursuant to the exchange offer. First, the shareholder could simply have held his shares in expectation of a better offer consistent with Roberts' letter of July 23.

Second, the institutional investors who were already interested in Reliance might have begun to purchase Reliance securities on the open market in anticipation of a more attractive offer stimulated by the disclosure of the amount of surplus surplus. Such an event would have affected the exchange offer in two separate but related ways—(1) those who were selling to the mutual funds and pension plans would not be exchanging and (2) the price of Reliance would have risen, reflecting the increased demand for the stock, consequently, diminishing the relative attractiveness of the Leasco package. Both of these conditions could have altered the nearly unanimous acceptance of the proposed tender offer by Reliance shareholders.

Third, with full disclosure of surplus surplus the anticipation of a better exchange offer may actually have been realized during the exchange offer period resulting in acceptance of the other offer or at least deterring acceptance of the Leasco offer.

Defendants have argued that the very fact of professional interest in Reliance coupled with wide distribution of the Netter Report eliminates the materiality of any disclosure of and estimate of surplus surplus. The Nutter Report was distributed, however, in August of 1967, fully a year before this registration statement was effective. Defendants cannot be heard to argue that noninsurance oriented, albeit professional, investment advisors will recall the estimate contained

in a report read a year earlier when presented with as cryptic a disclosure of possible surplus as we have in this case. It is a different matter to say—as we now do—that, given a concrete figure and plans to use it, they might have searched *for* that report and then realized its implications.

The Second Circuit told us in the *Texas Gulf Sulphur* case that the conduct of the parties themselves may give significant, possibly determinative, insight into the question of materiality. SEC v. Texas Gulf Sulphur, 401 F.2d 833, 851 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In *Texas Gulf Sulphur* the insider defendants purchased shares and calls based on information of a possible mineral strike without adequately disclosing such information to the public. The court found this conduct highly probative on the issue of materiality—it was obviously important information to the insiders since it motivated their purchase. That was a Rule 10b–5 case involving a proceeding by the Securities and Exchange Commission, and while our case involves a private suit on a registration statement under Section 11 of the 1933 Act, the lesson is transferable.

 Leasco included an estimate of surplus surplus in its January 31, 1969 registration statement. When it was offering its own securities, not trying to acquire those of a target company, it considered the size and quality of these assets held by its newly acquired subsidiary material and accordingly included such information. While not determinative, such conduct certainly has great evidentiary value in evaluating the significance and impact of such a disclosure on potential traders.

The central point in this analysis is not whether *any* one of the alternatives discussed would necessarily have been adopted by the "average prudent investor," but whether they are consistent with a disclosure—however carefully qualified—of an estimate of surplus surplus. We cannot say that such an inclusion was so trivial or inconsequential that an investor would be acting manifestly illogically if he refused to exchange his Leasco shares after it was disclosed. The importance of surplus surplus to Leasco, the significant interest of the securities professionals, and the general interest in capital-rich insurance companies all combine to make estimates of surplus surplus a material fact that should have been available to the Reliance shareholders when asked to exchange their shares for the Leasco package.

The solicited Reliance shareholders who received the prospectus in question "ought reasonably to [have been] informed" of an estimate of surplus surplus "before purchasing" the Leasco package. 17 C.F.R. § 230.405(*l*). It was a fact which these investors needed to "make an intelligent, informed decision whether or not to buy the security." Escott v. BarChris Construction Corp., 283 F.Supp. 643, 681 (S.D.N.Y.1968). It was a matter which had "an important bearing upon the nature or condition * * * or * * * business" of Reliance tending to deter acceptance of the exchange offer (*id.*) and "which in reasonable and objective contemplation might [have affected] the value of [Reliance's] stock." Kohler v. Kohler, 319 F.2d 634, 642 (7th Cir. 1963). *See* Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1971); SEC v. Texas Gulf Sulphur, 401 F.2d 833, 849 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); List v. Fashion Park, 340 F.2d 457, 462 (2d Cir.), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60, rehearing denied, 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344 (1965). It was a fact to which "a *reasonable man would attach importance* in determining" whether to accept the Leasco exchange offer. List v. Fashion Park, *supra* at 462. It was "reasonably certain to have a substantial effect on the market price" of Reliance shares and

which may have affected "the desire of [shareholders] to * * * sell, or hold" their shares. SEC v. Texas Gulf Sulphur, *supra,* 401 F.2d at 848–849. Disclosure would have had "a significant propensity to affect" the decision to exchange. Mills v. Electric Auto-Lite Company, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970). An approximation of surplus surplus, if included in the prospectus, "might have influenced [the Reliance shareholder's] decision" to exchange his shares; "A reasonable man in [the Reliance shareholder's] position might well have acted otherwise than to [exchange] if he had been informed * * *"; such a disclosure "could well influence" the decision of the Reliance shareholder. Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171–1172 (2d Cir. 1971).

Our finding that by failing to include an estimate-or-range-of surplus surplus in the registration statement Leasco "omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" establishes plaintiff's cause of action. 15 U.S.C. § 77k(a). All that remains is to consider the defenses provided by Section 11 and whether the defendants have sustained their respective burdens of proof with regard to those defenses.

### C. *Leasco*

■ Section 11 creates almost absolute liability in the issuer. *See* Escott v. BarChris Construction Corp., 283 F. Supp. 643, 683 (S.D.N.Y.1968); III L. Loss, Securities Regulation 1724 (1969); Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 190 (1933); Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 248 (1933); Comment, BarChris: Due Diligence Refined, 68 Colum.L.Rev. 1411, 1412 (1968).

■ Section 11(a) does provide all defendants with an affirmative defense that the plaintiff knew of the omission, but no evidence has been introduced that would indicate that either the plaintiff Feit, or any member of the class he represents, knew or had available an estimate of surplus surplus for Reliance. Proof that any particular member of the class had such knowledge may be presented at the next stage of the litigation on the issue of whether that individual is entitled to his share of damages.

Our finding of materiality has the effect of creating liability in the issuer and establishing that plaintiff is entitled to recovery at least against Leasco. The extent of such recovery will be discussed below.

### D. *Due Diligence of the Directors-Steinberg, Schwartz & Hodes*

Before analyzing the due diligence defenses presented by these defendants we must consider whether they are all properly treated together. Steinberg and Schwartz are and were, respectively, Chief Executive Officer and President of Leasco—clearly "inside" directors. Hodes is a partner in the law firm which represents Leasco; he held no management office.

The leading case of Escott v. BarChris Construction Corp., 283 F.Supp. 643 (S.D.N.Y.1968) drew a distinction between directors who were officers of BarChris and its director-lawyer, Grant, who occupied a position analagous to Hodes' at Leasco. Judge McLean treated Grant as an "outside" director despite the fact that he had been a director for eight months prior to the public offering in question and had prepared the registration statement. The court then held Grant to a very high standard of independent investigation of the registration statement because of his peculiar expertise and access to information and held him liable for failure to meet that standard. *BarChris, supra* at 689–692.

The assignment of "outside director" status to the lawyer in BarChris represented the court's conclusions on the facts peculiar to BarChris. It does not preclude a finding that "in some cases the attorney-director may be so deeply

involved that he is really an insider." Folk, Civil Liabilities Under the Federal Securities Acts—the *BarChris* Case, 1 Securities L.Rev. 3, 39 (1969) (reprinted from 55 Va.L.Rev. 1 (1969)). This is the case presented by Hodes.

■ Hodes has been a director of Leasco since 1965—three years or more at the time of this registration statement. He participated extensively in the discussions leading up to the exchange offer for Reliance shares as early as the fall of 1967 and was constantly involved in the deal throughout both the preliminary and execution stages of the transaction. He, or a representative of his law firm, attended all meetings and was consulted on all matters pertaining to this acquisition. He was directly responsible for preparation of the registration statement and initiated all of the research regarding reorganization of Reliance and separation of its surplus surplus. He kept Leasco's Schwartz apprised of the progress on possible alternatives for Reliance. The testimony and exhibits at this trial make it clear that insofar as surplus surplus is concerned Hodes was so intimately involved in this registration process that to treat him as anything but an insider would involve a gross distortion of the realities of Leasco's management.

Section 11(b) (3) (A) provides a "due diligence" in investigation defense to all defendants but the issuer.

"(b) Notwithstanding the provisions of subsection (a) of this section no person, other than the issuer, shall be liable as provided therein who shall sustain the burden of proof

&ast; &ast; &ast; &ast; &ast; &ast;

(3) that (A) as regards as part of the registration statement not purporting to be made on the authority of an expert, and not purporting to be a copy of or extract from a report or valuation of an expert, and not purporting to be made on the authority of a public official document or statement, he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; " 15 U.S.C. § 77k(b) (3) (A).

■ The defendant must establish (1) that he conducted a reasonable investigation and (2) that after such investigation he had reasonable ground to believe and did believe the accuracy of the registration statement. Thus, a defendant may fulfill his burden of investigation and still not have reasonable cause to believe in the completeness of the prospectus or he may simply fail in his duty to investigate. Liability will lie in either case.

■ The standard of reasonableness which applies is that of a reasonably prudent man managing his own property As stated in Section 11(c):

"In determining, for the purpose of paragraph (3) of subsection (b) of this section, what constitutes reasonable investigation and reasonable ground for belief, the standard of reasonableness shall be that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c)

There is little judicial gloss on this defense. *See* Escott v. BarChris Construction Corp., 283 F.Supp. 643, 683 (S.D. N.Y.1968). *Cf.* Gilbert v. Nixon, 429 F.2d 348, 357 (10th Cir. 1970) (Section 12(a)); Demarco v. Edens, 390 F.2d 836, 842–843 (2d Cir. 1968) (same). In fact, Judge McLean's opinion in *Bar-Chris* is the only one we have found which treats the subject at any length. The key to reasonable investigation as expressed in that opinion is independent verification of the registration statement by reference to original written records. The facts in *BarChris* revealed a consistent pattern of directors and underwriters who relied on the oral word of management regarding the accuracy of the regis-

tration statement. They made little, if any, effort to verify management's representations by reference to materials readily available such as corporate minutes, books, loan agreements, and various other corporate agreements.

Judge McLean makes it plain that a completely independent and duplicative investigation is not required but, rather, that the defendants were expected to examine those documents which were readily available. Speaking of the attorney-director's contentions he noted:

"It is claimed that a lawyer is entitled to rely on the statements of his client and that to require him to verify their accuracy would set an unreasonably high standard. This is too broad a generalization. It is all a matter of degree. To require an audit would obviously be unreasonable. On the other hand, to require a check of matters easily verifiable is not unreasonable. Even honest clients can make mistakes. The statute imposes liability for untrue statements regardless of whether they are intentionally untrue. The way to prevent mistakes is to test oral information by examining the original written record.

"There were things which Grant could readily have checked which he did not check. For example, he was unaware of the provisions of the agreements between BarChris and Talcott. He never read them." *BarChris, supra,* 283 F. Supp. at 690.

This theme of an obligation of reasonable verification is also reflected in the commentators' analysis of the *BarChris* case. *See* Wyant & Smith, *BarChris: A Reevaluation of Prospectus Liability,* 3 Geo.L.Rev. 122, 135–137 (1968); Comment, BarChris: Easing the Burden of "Due Diligence" Under Section 11, 117 U.Pa.L.Rev. 735, 744–748 (1969); Comment, Escott v. BarChris Construction Corporation: Section 11 Strikes Back, 21 Stan.L.Rev. 171, 184 (1968); Comment, BarChris: Due Diligence Refined, 68 Colum.L.Rev. 1411, 1418 (1968). *Cf.* United States of America v. Squires, 440

F.2d 859, 863 (2d Cir. 1971). The reasonable investigation—verification—requirement is simply one means of promoting the full disclosure policy of Section 11.

"The purpose of the civil liability imposed by section 11 is to protect the investor through full disclosure, and the standards of reasonable investigation must be framed in light of this goal. They should also reflect the two criteria set forth in the legislative history: (1) the importance of the role played by each participant in the scheme of distribution and (2) the reliance that the investor is justified in placing upon each participant. These criteria seem to be satisfied by a requirement that some of the parties to the registration process play a more adverse role vis-a-vis management than they may have in the past. The less a participant relies on management, the more the investor may rely on the involvement of the participant in the registration process." Comment, BarChris: Due Diligence Refined, 68 Column.L.Rev. 1411, 1419 (1968).

In BarChris the management directors were found to have known about the misrepresentations and therefore the only question of reasonable investigation arose in the context of non-insider verification of information provided by those inside directors. These standards nevertheless apply equally to insider verification of the accuracy and completeness of data and statements they propose to include in the registration statement. Inclusion or omission of an item without a reasonable investigation or verification will lead to liability for these inside directors just as surely as if they actually knew of the inaccuracy or had no reasonable belief in the accuracy.

What constitutes "reasonable investigation" and a "reasonable ground to believe" will vary with the degree of involvement of the individual, his expertise, and his access to the pertinent information and data. What is reason-

able for one director may not be reasonable for another by virtue of their differing positions.

> "It was clear from the outset, however, that the duty of each potentially liable group was not the same. The House report on the bill that became the original Securities Act stated that the duty of care to discover varied in its demands upon the participants with the importance of their place in the scheme of distribution and the degree of protection that the public had a right to expect from them. It has been suggested that although inside directors might be better able to show that they undertook some investigation, the outside director could more easily demonstrate that the investigation he actually undertook was sufficient to sustain his defense." Comment, BarChris: Due Diligence Refined, 68 Colum.L.Rev. 1411, 1416 (1968).

*See* Escott v. BarChris Construction Corp., 283 F.Supp. 643, 690 (S.D.N.Y. 1968); Folk, Civil Liabilities Under the Federal Securities Acts: The *BarChris* Case, 1 Securities L.Rev. 3, 53–54 (1969) (reprinted from 55 Va.L.Rev. 1 (1969)); Comment, BarChris: Easing the Burden of "Due Diligence" Under Section 11, 117 U.Pa.L.Rev. 735, 738 (1969).

■■■ Inside directors with intimate knowledge of corporate affairs and of the particular transactions will be expected to make a more complete investigation and have more extensive knowledge of facts supporting or contradicting inclusions in the registration statements than outside directors. Similarly, accountants and underwriters are expected to investigate to various degrees. Each must undertake that investigation which a reasonably prudent man in that position would conduct.

*BarChris* imposes such stringent requirements of knowledge of corporate affairs on inside directors that one is led to the conclusion that liability will lie in practically all cases of misrepresentation. Their liability approaches that of the issuer as guarantor of the accuracy of the prospectus.

> "This ruling suggests that an inside director who, either as an officer or in some other capacity, has intimate familiarity with the corporate affairs or handles major transactions, especially those as to which false statements or omissions appear in the prospectus, is least able to establish due diligence. *BarChris* indicates that for such an individual knowledge of the underlying facts precludes showing 'reasonable ground to believe' or belief in fact as to the truth of the nonexpert statements. In substance, there is a strong though theoretically rebuttable presumption that he had no reasonable ground to believe or belief in fact that the registration statement was accurate. Since an individual so situated will also have difficulty showing an absence of reasonable grounds of belief or belief in fact that expertised portions contain no misleading statements or omissions, a similar although less weighty presumption is present there. It would be fair to say that this postulated presumption arises when the intimate connection of the individual with the affairs of the issuer is demonstrated. Such an individual comes close to the status of a guarantor of accuracy." Folk, Civil Liabilities Under the Federal Securities Acts: The *BarChris* Case, 1 Securities L.Rev. 3, 25 (1969) (reprinted from 55 Va.L.Rev. 1 (1969)).

Comment, BarChris: Due Diligence Refined, 68 Colum.L.Rev. 1411, 1420 (1968). It is with this strict standard in mind that we must approach the question of whether these three inside directors have established their defenses.

■■ As already indicated, defendants' principle claim is that they considered including an estimate and decided against such action because of the uncertainties of computation. Steinberg and Hodes were both convinced, according to their testimony, that the estimates they had obtained were not reliable and that a

reliable one could not be achieved with the data available. The key to all of their arguments is the unavailability of Reliance's management and the Pennsylvania Insurance Commissioner. We find that the director-defendants failed to fulfull their duty of reasonable investigation and that they had no reasonable ground to believe that an omission of an estimate of surplus surplus was not materially misleading.

### (1) *Lack of Belief in Surplus Surplus Estimates.*

These defendants did not have reasonable grounds to believe that the estimates of $80, $100, and $125 million in their possession were so inaccurate that one or all of them could not have been included in the prospectus with a carefully drafted qualifying statement similar to the one accompanying the inclusion in the January 31, 1969 registration statement. Defendants argue that the $125 million figure included in that prospectus was more reliable because Roberts had been consulted and approved the figure. This contention is rejected as unbelievable on the basis of the entire situation and Roberts' own testimony that he himself brought up the subject of the figure included in the draft prospectus because he had never seen it before and was curious as to its origin.

Defendants also maintain that the Pennsylvania Insurance Commissioner had been consulted and approved the figure contained in the February prospectus. This is not true.

It appears that the estimates prepared by Netter and Gibbs were considered sufficiently reliable by those defendants to predicate major expenditures in time and money in mounting the takeover drive. The $125 million estimate was used as a working figure in the research concerning reorganization alternatives for Reliance during and after the tender period. The defendants did not have reasonable grounds to believe that the estimates they already had were so inaccurate as to warrant exclusion from the prospectus.

### (2) *Hostility of Roberts.*

Defendants also argue that the management of Reliance, particularly Roberts, was so hostile to the exchange offer that the information necessary to calculate surplus surplus accurately was unavailable throughout the entire exchange offer period. They further contend that this hostility denied them standing before the Insurance Commissioner and hence his approval of a meaningful approximation. The facts of Roberts' relationship with Leasco do not support this contention.

It is true that Roberts evinced considerable hostility to both the exchange offer and Leasco prior to August 1, 1968. Peace was made on that date at a considerable financial gain to Roberts and cooperation began at once and increased in intensity.

The Court can reach but one conclusion in the face of the facts set out in Part IV B, *supra*—Roberts would have cooperated in the calculation of an amount of surplus surplus after August 1, 1968 if he had been asked. He testified that he could have arrived at an estimate "damn quickly" if necessary, and it is our finding based on his testimony, our observation of him on the stand, and the sense of the situation that he would have done so—or at least would have provided the information necessary for such a calculation.

Defendants have made much of the provision inserted in the August 1st agreement which insulates Reliance from any obligation "to cooperate in the preparation of any Registration Statement * * * or to assume or take any liabilities or responsibility in connection therewith." Roberts, it is argued, insisted on this clause in order to avoid supplying any information to Leasco. Defendants suggest that this represents a continued hostility and refusal to cooperate which existed throughout the exchange offer period.

We interpret this paragraph differently. It is patent that Roberts would have been unwilling to lend his name to a reg-

istration statement to which he was basically opposed, thereby incurring the possibility of liability such as that we are here discussing. He was very cautious and protected himself from any formal involvement in the registration process. We cannot conclude from this exercise of caution that he would not have provided data on an informal, or general basis, not for attribution, but rather to aid Leasco's own people in their calculations.

Defendants moved to reopen the trial after the court announced its tentative findings indicating its conclusion regarding Roberts probable cooperation. Accompanying a proffer of proof in support of that motion was an affidavit executed by Roberts. This affidavit confirmed the Court's impression of him as a meticulous man who protected himself at all times. His affidavit indicates that at no time would he have provided information for inclusion in the prospectus. It did not state that he would not have provided general information or data or that he would have refused to confirm the calculation of others.

After hearing the Court's interpretation of Roberts' first affidavit defendants submitted another which indicated in substance that he would have provided no information whatsoever through September 16, 1968, but that after that time he would have provided general information. He reiterated that he would never have provided information leading to an estimate of surplus surplus. This second affidavit does not weaken our impression that Roberts would have cooperated during the pendency of the exchange offer. We cannot credit his statement that none of the general information he would have provided would have led Leasco to an estimate of surplus surplus. Furthermore, we conclude that he would have supplied general information at any time after August 1, not just after September 16. Even if we were to credit his assertion that September 16 was the first date at which he would have cooperated—which we do not—we are left with the conclusion that for more

than half the exchange offer period he was available at the beck and call of Leasco for information. The defendants neither beckoned nor called.

The critical point of this analysis is that Leasco, and particularly the three inside defendants, knew of the rapprochement with Reliance and were cognizant of all its ramifications. Being able, aggressive businessmen they must be held to an understanding of the implications of Roberts tacit abdication of his duty to his shareholders in return for personal benefits. It could not but have occurred to them that after August 1st he might have been receptive to inquiries about surplus surplus and other corporate information. By relying on a state of facts which existed in June and July they ignored the obvious potential source of invaluable information they had acquired by consummation of the August 1, 1968 contract.

We find that these three defendants did not have reasonable ground to believe that omission of an estimate of surplus surplus from the registration statement was justified on the ground that they did not have access to the pertinent data on Reliance or entre to the Insurance Commissioner. Roberts would have provided both had he been asked. They ignored this fact in concluding that an accurate estimate of surplus surplus could not be developed by Leasco. They failed to exercise that high degree of care imposed upon them by Section 11.

### (3) Lack of Adequate Inquiry.

Even if both of our prior conclusions regarding the lack of reasonable ground to believe in the accuracy of the registration statement were in error, these insider-defendants have nevertheless failed in their duty to reasonably investigate the accuracy of the prospectus. The uncontroverted testimony of two of the defendants themselves—Steinberg and Hodes—was that neither they nor anyone else in Leasco ever attempted to obtain a compuation of surplus surplus beyond those of Leasco's Gibbs.

Surplus surplus was a crucial element of the plan to acquire Reliance. Yet, no one connected with Leasco commissioned an estimate by an insurance consultant; no one asked any Leasco employee to calculate it; Hodes never ordered one of his law firm's associates to attempt to arrive at a figure; and certainly no one made inquiry of one man who would have easily produced a figure—Roberts.

These defendants proceeded on the assumption that they could not arrive at an accurate figure without making the attempt. They may have failed—although we do not believe they would have—but they were bound by their duties under Section 11 to attempt to verify their conclusion that it was not calculable. It is this sort of laxity and oversight to which the requirement of reasonable investigation is directed and which Judge McLean held unacceptable in *BarChris*. By assiduously proving that they never had figures other than those previously alluded to these defendants have persuaded the court that they failed to vindicate their responsibility of due diligence.

 Nor can it be argued that they need not have attempted the computation or made any inquiry because such gestures would have been futile. Roberts testified that any one knowledgeable in the insurance field might have arrived at a considered figure. Section 11 requires an attempt to make use of such expertise. Hodes, Schwartz and Steinberg are liable along with the issuer, Leasco.

### E. *Due Diligence of the Dealer-Managers—White, Weld & Co. and Lehman Brothers.*

 Section 11 holds underwriters to the same burden of establishing reasonable investigation and reasonable ground to believe the accuracy of the registration statement. The courts must be particularly scrupulous in examining the conduct of underwriters since they are supposed to assume an opposing posture with respect to management. The average investor probably assumes that some issuers will lie, but he probably has somewhat more confidence in the aver-

age level of morality of an underwriter who has established a reputation for fair dealing. Judge McLean expressed the proper relationship between underwriters and management in *BarChris:*

"In a sense, the positions of the underwriter and the company's officers are adverse. It is not unlikely that statements made by company officers to an underwriter to induce him to underwrite may be self-serving. They may be unduly enthusiastic." Escott v. BarChris Construction Corp., 283 F. Supp. 643, 696 (S.D.N.Y.1968).

In light of this adverse position they must be expected to be alert to exaggerations and rosy outlooks and chary of all assurances by the issuer. Their duty is to the investing public under Section 11 as well as to their own self-interest and that duty cannot be taken lightly.

"Such adversity is required since the underwriter is the only participant in the registration process who, as to matters not certified by the accountant, is able to make the kind of investigation which will protect the purchasing public. Management may be so hard pressed for cash and so incorrigibly optimistic that they will accept or undervalue the risk of civil liability. The directors, as noted above, are not free to assume an adverse role, and in any event they are not entirely free from the pressures on and optimism of management. The SEC simply does not have the staff to verify independently even the more dubious registration statements. Only the underwriter and the accountant are free to assume an adverse role, have little incentive to accept the risk of liability, and possess the facilities and competence to undertake an independent investigation. They may therefore reasonably be required to share the burden of verification.

"The duty of the underwriter, then, is not merely limited to listening to management's explanations of the company's affairs. Rather he must make an investigation reasonably calculated to reveal all of those facts which would

be of interest to a reasonably prudent investor. If he undertakes such an investigation, he will not be liable for material misrepresentations which his efforts did not uncover. If he does not, he will be liable for all misrepresentations which such an investigation would have uncovered.

"It is difficult to speculate as to what would constitute an investigation reasonably calculated to reveal those facts which would be of interest to a reasonably prudent investor. Of course all would agree that the underwriter should read minutes and important contracts and check out any inconsistencies in the representations of management. But the spirit of Judge McLean's opinion undoubtedly requires something more." Comment, BarChris: Due Diligence Refined, 68 Colum.L.Rev. 1411, 1421 (1968).

■■■ Dealer-managers cannot, of course, be expected to possess the intimate knowledge of corporate affairs of inside directors, and their duty to investigate should be considered in light of their more limited access. Nevertheless they are expected to exercise a high degree of care in investigation and independent verification of the company's representations. Tacit reliance on management assertions is unacceptable; the underwriters must play devil's advocate. Comment, BarChris: Due Diligence Refined, 68 Colum.L.Rev. 1411, 1417 (1968). *See* Escott v. BarChris Construction Corp., 283 F.Supp. 643, 696–697 (S.D.N.Y.1968); Folk, Civil Liabilities Under the Federal Securities Acts: The *BarChris* Case, 1 Securities L.Rev. 3, 61 (1969) (reprinted in 55 Va.L.Rev. 1 (1969)); Comment, Escott v. BarChris Construction Corporation: Section 11 Strikes Back, 21 Stan.L.Rev. 171, 180 (1968). *Cf.* SEC v. North American Research and Development, 424 F.2d 63, 82–84 (2d Cir. 1970); Globus v. Law Research Service, 418 F.2d 1276, 1288 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); Hanly v. SEC, 415 F.2d 589, 595–597 (2d Cir. 1969).

■■ We find that the dealer-managers have just barely established that they reasonably investigated the surplus surplus concept as it related to Reliance and that they had reasonable ground to believe that omission of a specific figure was justified.

The evidence indicates a thorough review of all available financial data by White, Weld & Co. and its counsel. They independently examined Leasco's audit and the report of an actuary on Reliance. They made searching inquiries of Leasco's major bank. Whitney, counsel to the dealer-managers, undertook a study of Leasco's corporate minutes, records and major agreements.

Regarding surplus surplus, the dealer-managers were particularly careful in their inquiries of Leasco. Stone of White, Weld had considerable prior experience with surplus surplus. He was fully aware of the complexity of the computation problem. The Netter Report, Gibbs' Memorandum and New York Insurance Department Report were all referred to at the due diligence meetings held late in June and early in July of 1968 in New York where representatives of Leasco and the dealer-managers reviewed the proposed registration statement line by line. Based on these reports and on his own expertise, Stone briefed Whitney, lead counsel for the underwriters.

Whitney and Stone were informed by Leasco that Roberts was hostile to the exchange offer—which, in fact, was the case in early July when these meetings were held; that he would not cooperate by providing either information or an estimate of his own; and that he would not verify the approximations they already had in their possession. This assertion was reinforced by Roberts' June 24, 1968 letter to his shareholders urging them "not to act in haste" and by his May 15, 1968 letter concerning his intention to form a holding company for Reliance. Counsel for White Weld was also aware of Hodes' June 24, 1968 telegram to Roberts requesting cooperation in the preparation of a registration statement

and of Roberts' reply of July 1, indicating that Reliance would not then comply.

Based on the information supplied by Leasco and confirmed by examination of these documents, Whitney rightly concluded that as of July 5th Roberts would not cooperate either by providing an opinion, by furnishing the critical data, or by verifying the estimates included in the Netter Report and Gibbs' Memorandum. In his opinion surplus surplus could not then be calculated with any accuracy.

The underwriters did not themselves contact Roberts because they had ascertained to their satisfaction that he would not be cooperative. Throughout July, Whitney and Stone were in constant contact with Leasco representatives regarding the progress of the exchange offer. During this period they received yet further verification of Roberts' intransigence which reconfirmed Whitney's opinion and certainly could not have provided a reasonable ground to reject his earlier conclusion. First, they learned of the subsequent requests for information directed to Roberts on July 9 and July 12 and of his evasion of such inquiries on July 15. They were, of course, aware that Roberts had filed a law suit seeking to inhibit any exchange offer. Finally, any doubt which may have lingered regarding Roberts' attitude was dispelled by his July 23rd letter of opposition to his shareholders in which he discussed in detail the reasons why the offer should be rejected.

We find, therefore, that it is somewhat more probable than not that as of August 1, 1968 the dealer-managers had sufficient verification of their previous conclusion concerning the possibility of accurately computing surplus surplus. They still had reasonable ground to believe that omission of such a figure was not misleading.

The dealer-managers were, however, undoubtedly aware of the August 1st contract between the Reliance management and Leasco and absent any further verification, their failure to recognize the implications of this agreement might well create liability for the same reasons expressed in our discussion of the defenses of the directors. But Whitney was in continuous contact with Leasco after August 1st and was apparently never disabused of the notion that Roberts remained recalcitrant. This view was conclusively buttressed by receipt of a copy of a letter dated August 13, 1968 from Kenneth J. Bialkin of Wilkie, Farr & Gallagher to the SEC, set forth at page 562, *supra,* stating that Reliance officials "have * * * declined to furnish information." Receipt of this letter served to reconfirm Whitney's belief that neither data nor advice would be forthcoming from Roberts. The registration statement became effective six days later, on August 19, 1968.

Though the finding might have gone the other way, on balance we conclude that the dealer-managers conducted a reasonable investigation and reasonably verified Leasco's representations that access to Reliance's management was precluded by Roberts' attitude. We note in passing that neither of the underwriters had their names on the January, 1969 Leasco prospectus which did rely on the $125 million estimate of surplus surplus.

Both White, Weld & Co. and Lehman Brothers have established their due diligence defenses with regard to this registration statement.

## X. SECTION 12(2), SECTION 17(a), SECTION 10(b) AND RULE 10b–5, AND SECTION 14(e)

The gravamen of plaintiff's action concerns the accuracy of the registration statement filed in connection with Leasco's exchange offer. Congress specially tailored Section 11 to provide liability for misrepresentations and omissions of material fact in such documents. It wrestled with the delicate problem of what degree of liability to impose on different classes of defendants and arrived at a unique resolution. Thus it considered imposing insurer's liability on directors as well as on the issuer but rejected such a harsh rule in favor of the due diligence defenses now provided. *See* Martin v. Hull, 67

App.D.C. 284, 92 F.2d 208, 210, cert. denied, 302 U.S. 726, 58 S.Ct. 47, 82 L.Ed. 561 (1937). Similarly, it created fine distinctions between liability for "expertised" and "non-expertised" sections of the registration statement. 15 U.S.C. § 77k(b). It also provided liability for experts on a different basis from that imposed on other defendants. *See* Escott v. BarChris Construction Corp., 283 F. Supp. 643, 697–698 (S.D.N.Y.1968).

■ In light of our finding of liability under this carefully wrought provision, we need not now decide the serious questions of liability under Section 12(2) and Section 17(a) of the 1933 Act (15 U.S.C. §§ 77*l* and 77q) or under Section 10(b), Rule 10b–5, and Section 14 (e) of the 1934 Act (15 U.S.C. § 78j(b), 17 C.F.R. 240.10b–5, and 15 U.S.C. § 78n (e)). We do not, by this action, mean to imply that liability under Section 11 in any way precludes recovery under any other section of the securities laws. *Cf.* SEC v. National Securities, 393 U.S. 453, 468, 89 S.Ct. 564, 572–573, 21 L.Ed.2d 668 (1969); Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963); Diamond v. Oreamuno, 24 N.Y.2d 494, 502, 301 N.Y.S.2d 78, 84, 248 N.E.2d 910 (1969). We find merely that a recovery in this case under Section 11 fully vindicates the full disclosure policy of the securities laws and provides plaintiffs with a fair and just measure of compensation. *See* Gilbert v. Nixon, 429 F.2d 348, 355 (10th Cir. 1970).

■ It may be that liability would lie under Section 12(2) since the elements prerequisite to recovery are essentially the same—materiality of the omission and failure to exercise reasonable care. *See* Gilbert v. Nixon, 429 F.2d 348 (10th Cir. 1970); Johns Hopkins University v. Hutton, 422 F.2d 1124 (4th Cir. 1970); Demarco v. Edens, 390 F.2d 836 (2d Cir. 1968). Such liability would be merely duplicative of Section 11 on the facts of this case. It does, as plaintiff urges, offer rescission as an alternative to damages, but such relief is unrealistic on these facts. Many members of the class have already divested themselves of the Leasco package and those who still hold it would, if granted rescission, be winning the dubious benefit of being minority shareholders in a corporation totally controlled by Leasco. Damages under Section 11 provide a more equitable remedy.

Serious, unresolved ambiguities surrounding the scienter requirement in Rule 10b–5 and possibly Section 14(e) of the 1934 Act and 17(a) of the 1933 Act are presented to any court asked to decide liability under all three of these general anti-fraud provisions. *See* Globus v. Law Research Service, 418 F.2d 1276, 1290–1291 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L. Ed.2d 93 (1970); SEC v. Texas Gulf Sulphur, 401 F.2d 833, 854–855, 866–868 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC and Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *Cf.* SEC v. Capital Gains Research Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In-as-much as we conclude that Section 11 provides a complete remedy for the plaintiff-class and the investing public, we intimate no conclusion regarding applicability of plaintiff's alternative prayers for relief under other theories.

## XI. DAMAGES

Plaintiff has urged numerous remedies on the Court but now seems to press only four: (1) statutory damages under Section 11; (2) a "conversion" measure of damages for those who have sold the Leasco package—i. e., the difference between the price at which they sold the package and the highest price Leasco traded at within a reasonable period after disclosure; (3) rescission for those who still hold the Leasco package; or (4) restitution—the difference between the price they received for their Reliance shares and that at which they sold the

Leasco package or its current value if they still hold it. The latter three proposals are predicated largely on liability pursuant to the general anti-fraud provisions discussed above, not Section 11.

■ Section 11(e) sets out an explicit measure of damages for those entitled to recover under Section 11(a). It provides for the difference between what was paid for the security and its value at the time the suit was brought, what it was sold for before suit, or what it was sold for after suit was commenced if that figure is greater than the value at the time the suit was started. It reads in pertinent part:

"The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: *Provided*, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable." 15 U.S.C. § 77k(e).

*Cf.* Martin v. Hull, 67 App.D.C. 284, 92 F.2d 208, cert. denied, 302 U.S. 726, 58 S.Ct. 47, 82 L.Ed. 561 (1937); Shonts v. Hirliman, 28 F.Supp. 478 (S.D.Cal. 1939); Thorn v. Austin Silver Mining, 171 Misc. 400, 12 N.Y.S.2d 675 (Sup.Ct. 1939).

Initially we must determine "the amount paid for the security." The security here is the Leasco package of one preferred share and one-half warrant; the consideration surrendered for it was one share of Reliance common stock. Testimony of plaintiff's expert comparing the intrinsic rather than the market value of Leasco and Reliance shares is not persuasive. It is too speculative for purposes of assessing damages in this case.

■ We recognize that once a plaintiff has shown that the defendant has violated his substantive rights and that he is entitled to damages, he ought not to be held to the high level of proof required for other elements of this case. The somewhat speculative nature of damages ought not to prevent a plaintiff from recovering; where there is a substantial question, the facts must be construed, within reasonable limits, against the tort feasor.

Plaintiff also argues that the value of the Reliance stock should be taken to be that amount publicized by Leasco as the amount *received* for purposes of computing capital gains on the Reliance shares— $72\frac{7}{8}$. This figure represented the market price of the Leasco package on September 13, 1968, the last trading before Leasco accepted the 72% of Reliance shares tendered and declared the exchange offer effective.

■ Plaintiff's proposed figure for Reliance is unacceptable for two reasons. First, it represents the amount received, not paid, as of that date and Leasco was admittedly offering a premium in order to induce tenders. Second, the prospectus in question was submitted in support of a solicitation of tender. We assume, therefore, that the plaintiff evaluated the exchange proposal based upon

the information it contained. The first page of the prospectus lists $66¼ as the closing price of Reliance on August 16, 1968, the last day of trading before the effective date of the registration statement. Presumably, Reliance shareholders used that figure in deciding whether the Leasco package offered was attractive enough to accept. August 16 was the last day of free trading unaffected by the prospectus so that the price of Reliance shares on that day is the best indication we have of open market valuation. We assume that this sum represented the amount that the offerees intended to relinquish in return for Leasco securities. Accordingly, we find that $66¼ was "the amount paid for" the Leasco package.

Unpersuasive are defendants' contention that the $66¼ figure is too high, representing as it does appreciation in the market price of Reliance resulting from the imminence of the exchange offer. The simple answer is that demand has always played an inseparable role in determination of price. The appreciation Leasco speaks of is merely a reflection of the market's recognition of the attractiveness of Reliance as the subject of acquisition. It was Leasco's own desire to purchase Reliance which helped create this increment in price; having caused the inflation it cannot now complain that it was not really worth that much. Under the market conditions then prevailing this price did represent the actual value of Reliance.

■ This determination of the "amount paid" does not entirely resolve the damage question. Section 11(e) provides a causation defense to a defendant who "proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted * * *." 15 U.S.C. § 77k(e). We cannot consider any damages caused, not by defendants' omissions, but by independent forces. *See* Fox v. Glickman, 253 F.Supp. 1005,

1010 (S.D.N.Y.1966). *Cf.* Escott v. BarChris Construction Corp., 283 F.Supp. 643, 703–704 (S.D.N.Y.1968).

■ We take judicial notice of the very drastic general decline in the stock market in 1969. *See* Revised Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 201(b)(2)(March 1971). Standard and Poor's Daily Stock Price Index rose gradually from 98.68 on August 16, 1968 to a high of 109 in both November and December of 1968 and then dropped back to 97.97 on October 27, 1969—the date this suit was commenced. It continued to drop for some months thereafter. The Dow Jones Price Average arose from about 917 in early September 1968 to a high of 996 in December 1968 and plunged 135 points to 860.28 on October 27, 1969.

■ In light of the decline, which extended beyond October 27, 1969, we cannot but conclude that some portion of the diminution of Leasco's price was due to market factors which would have affected any security and that, to that extent, plaintiff's damages were not "caused" by the omissions in the registration statement. *See* Fox v. Glickman, 253 F.Supp. 1005, 1010 (S.D.N.Y.1966).

The damage figure should be adjusted to take account of the market decline. Of the two market indexes referred to above, Standard and Poor's is preferable for our purposes because it is based on a larger sample of securities and is less likely to reflect trends unique to one industry. The adjustment will be made by multiplying the "amount paid" ($66¼) by the reciprocal of the decline in Standard and Poor's from August 16, 1968 to the day of sale of the Leasco securities by a member of the plaintiff's class.

Before turning to the actual method of computation, two additional considerations must be noted. First, the Leasco package or portions of it will be deemed sold on the date of the sale of preferred shares. We choose to focus on the pre-

ferred shares for this determination be-cause the warrants are much more specu-lative and trading in them will not as clearly indicate the investor's intention to divest himself of the securities ob-tained in exchange for his Reliance shares. Moreover, since one share of pre-ferred Leasco was distributed for each share of Reliance common relinquished, the direct comparison of prices is facili-tated by determining damages on the date of sale of the preferred. If, in any case involving large holdings, this arbi-trary decision creates unfairness, sales of preferred and warrants can be separate-ly treated.

Absent some special situation, a class member will be deemed to have sold an entire unit of the Leasco package each time he made a sale of one share of pre-ferred regardless of whether he contem-poraneously sold warrants or whether he sold them in the exact ratio contained within the package. Damages will there-fore be computed by comparing the mar-ket-adjusted "price paid" with the value of an entire unit of the Leasco package on the day of sale of the preferred.

An element of arbitrariness is inherent in such rigid determinations. Some plain-tiffs will undoubtedly recover less than they would under a formula precisely determining the percentage of the Re-liance share which should be apportioned to each portion of the Leasco package on the day of sale, thereby achieving exact comparison for warrants sold as well as preferred. Conversely, some members of the class will receive wind-falls. But any other method would en-tail allocating the value of the Reliance shares between the warrants and prefer-red shares and any such apportionment necessarily entails its own element of arbitrariness. The ratio of preferred to warrant price has fluctuated widely.

Particularly in a class action the dam-age question must be approached prag-matically. It is important that the dis-pute be ended and that we fashion a reme-dy which provides substantial fairness. Too much precision might destroy ef-ficacy as a result of an expensive at-tempt to obtain a measure of damages suitable to each of possibly thousands of shareholders.

The second preliminary matter which must be dealt with is that Leasco declar-ed a five for two split of its warrants effective February 12, 1969. Therefore, an investor who sold his Leasco preferred shares on or after that date will be deem-ed to have sold one and one-quarter war-rant as well as one preferred share at the prices quoted on the date of sale. As a practical matter these are the only plain-tiffs who we will have to consider since the price of the Leasco package did not drop below $66¼ until late in June of 1969 and those who divested themselves earlier will recover no damages.

Plaintiffs' and defendants' attorneys agree that the Leasco package, including adjustment for the warrant split, had an average price of $71 on October 27, 1969 —the date this law suit was commenced. For those who presently hold Leasco pre-ferred shares or who sold them after October 27, 1969 there can be no recovery.

We turn now to the actual method of computation to be used in determining re-covery for those who sold Leasco securi-ties before October 27, 1969. (1) The Standard and Poor's index for the day of the sale will be divided by 98.68—the Standard and Poor's reading on August 16, 1968—yielding the reciprocal of the general market decline. (2) The quo-tient obtained in Step 1 above will be multiplied by $66.25 to arrive at a mar-ket-adjusted "price paid" for the Leasco package. If the product obtained is greater than $66.25 then $66.25 will be used as the base figure since we are con-sidering only declines in the market. (3) For each share of Leasco preferred sold add the market quotation for such share on the date of its sale to 1¼ times the market price of Leasco warrants on that day. (4) The damages to be recov-ered on each share sold will be deter-mined by subtracting the sum derived in Step 3 from the "price paid" as deter-mined in Step 2.

A brief example may help to clarify the computation. If an investor sold 100

shares of Leasco preferred on some hypothetical date in July 1969 he would be deemed to have sold 125 warrants as well as the 100 shares. Assume that the Leasco preferred were selling at $42 and the warrants at $11 with the Standard and Poor's at 95 on that date. The plaintiff's damages resulting from that sale are determined as follows: (1) Divide the Standard and Poor's reading of 95 by 98.68 yielding .96. (2) Multiply .96 by $66.25 obtaining an adjusted "price paid" of $63.60. (3) Add $42 to $11 times 1.25 for an amount received of $55.75. (4) Subtract $55.75 from $63.60 yielding per share damages of $7.85. Thus our hypothetical investor's recovery upon the sale of 100 Leasco preferred is $785.

## XII. CONCLUSIONS

Members of the plaintiff-class are entitled to recover money damages pursuant to Section 11 of the Securities Act of 1933. 15 U.S.C. § 77k. The failure to include an estimate of surplus surplus in the registration statement filed in conjunction with this exchange offer was an omission of a material fact required to be stated to prevent the statements from being misleading. The three individual director-defendants who have appeared, Hodes, Schwartz and Steinberg, failed to make a reasonable investigation with regard to inclusion of such an estimate and did not have a reasonable ground to believe that this failure was not an omission to state a material fact. The issuer, Leasco, and these three directors are jointly and severally liable to the class. 15 U.S.C. § 77k(f).

The two dealer-manager defendants— White, Weld & Co. and Lehman Brothers —performed a reasonable investigation with regard to the propriety of an inclusion of an estimate of surplus surplus and had a reasonable ground to believe and did believe that the failure to include such a figure was not an omission to state a material fact. Accordingly they have established their due diligence defense and are not liable to the class.

So ordered.